DAKOTA, MINNESOTA & EASTERN
RAILROAD CORP., Plaintiff,

v.

State of SOUTH DAKOTA; William
Janklow, in his official capacity as
Governor of the State of South Dako-
ta; and the Transportation Commis-
sion of the South Dakota Department
of Transportation, an executive agen-
cy of the State of South Dakota, De-
fendants.

No. CIV. 02–4083.

United States District Court,
D. South Dakota,
Southern Division.

Dec. 6, 2002.

Brian J. Donahoe, Michael D. Bornitz, Kimberly R. Wassink, Cutler & Donahoe, Sioux Falls, SD, for Plaintiff.

Brent A. Wilbur, Neil K. Fulton, May, Adam, Gerdes & Thompson, Pierre, SD, for Defendant.

## MEMORANDUM OPINION AND ORDER

PIERSOL, Chief Judge.

This matter came before the Court for trial on August 14, 2002. At the trial, both parties presented evidence and argument regarding the eminent domain issues initially decided by the Court in entering the preliminary injunction. Both parties have now filed post-trial briefs as requested by the Court. The following opinion resolves the claims of the Plaintiff with respect to those issues regarding eminent domain. Still pending before the Court, however, is the Plaintiff's 4–R Act claim in which the Plaintiff alleges that the Defendant violated federal law in discriminating against railroads with respect to tax credits and assessments. The parties are in the process of conducting discovery with regard to the 4–R Act claim, and that claim will be dealt with in a subsequent opinion of the Court.

## BACKGROUND

The Plaintiff, Dakota, Minnesota & Eastern Railroad Corp. (DM & E) filed an action against the State of South Dakota, Governor William Janklow, in his official capacity, and the Transportation Commission of the South Dakota Department of Transportation seeking declaratory and injunctive relief. DM & E's main claims are that the State's modifications of its eminent domain statutes regarding railroads are unconstitutional and preempted by federal law. DM & E moved for a preliminary injunction enjoining the State from enforcing its eminent domain statutes pending the outcome of this litigation.

The Court entered a preliminary injunction enjoining enforcement of S.D.C.L. 49–16A–75.3(1),(2), & (4) and denied the preliminary injunction with respect to the remainder of the challenged statutes.

DM & E is a railroad operating in interstate and intrastate commerce as a common carrier. In 1986 a group of investors created DM & E and purchased the Chicago & North Western Railroad Company. At the time of the purchase, the railroad was, and still is, in dire need of repair and improvement. In an effort to raise the revenue necessary to complete the repairs, DM & E decided to expand into new markets. In 1998, DM & E began the process of extending its track into an area of Wyoming known as the "Powder River Basin" in order to access significant markets for low sulfur coal mined in the basin. As part of this new project, referred to as the PRB project, DM & E plans to construct new track in the Powder River Basin as well as improve and reconstruct DM & E's existing lines.

In order to acquire the approval necessary to construct the PRB project, DM & E filed an application with the Surface Transportation Board (STB), a federal agency, seeking authority under 49 U.S.C. § 10901 to construct and operate new rail lines in South Dakota, Wyoming and Minnesota, and to rebuild much of its existing mainline track. The application was filed on February 20, 1998. The STB conducted an extensive review of the proposed project including analysis of the environmental implications of the project, the degree of environmental mitigation required, the financial fitness of the project, the effect of the project on public transportation, and whether bypasses should be constructed around certain areas. After comprehensive review, the STB issued its decision on January 28, 2002 authorizing the PRB project. The STB decision de-

tails the mitigation required, finds that DM & E has demonstrated financial fitness to carry the project through to completion and specifically rejects all bypass alternatives posed, primarily on environmental grounds.

Although the STB conducted an extensive review of the project, the Board did not address the issue of eminent domain. In the Final Environmental Impact Statement, the STB stated the following:

> Eminent domain proceedings are regulated by state law and not administered by the Board. In rail construction cases before the Board, the Board determines whether the construction is inconsistent with the public convenience and necessity under 49 U.S.C. 10901 but the applicant is responsible for the acquisition of land necessary for execution of the proposed project. The Board has encouraged DM & E to negotiate with affected communities and individuals if the construction is approved to develop private agreements regarding the acquisition and use of land. DM & E has worked with the Landowner Advisory Board to develop a Land Use Mitigation Policy and Plan that addressed project impacts on private lands. In the event that the proposed project is approved and DM & E cannot reach agreements with landowners, eminent domain proceedings may be pursued as an avenue of last resort.

*See* Supplemental Affidavit of Dana L. Nelson, Doc. 37, Final Environmental Impact Statement, page 33.

In 1999, while DM & E was awaiting approval of the STB, the State of South Dakota enacted changes in its state eminent domain laws with respect to railroads. Prior to 1999, S.D.C.L. 49–16A–75 reads as follows: "A railroad may exercise the right of eminent domain in acquiring right-of-way as provided by statute." This prior law was a clear delegation of the State's eminent domain power to railroads with only the restriction that the railroad comply with the procedures outlined for the exercise of eminent domain contained in S.D.C.L. 21–35. The 1999 amendments significantly changed the law and added three new statutes. South Dakota eminent domain law as it regards railroads is now controlled by S.D.C.L. 49–16A–75 through 49–16A–75.3 which read in total as follows:

**Powers—Eminent domain—Authorization by Governor or commission.** A railroad may exercise the right of eminent domain in acquiring right-of-way as provided by statute, but only upon obtaining authority from the Governor or if directed by the Governor, or the commission, based upon a determination by the Governor or the commission that the railroad's exercise of the right of eminent domain would be for a public use consistent with public necessity. The Governor or the commission shall consider the requirements of §§ 49–16A–75.1 to 49–16A–75.3, inclusive, when granting or denying an application for authority to use eminent domain. The decision to grant or deny an application shall be made after reasonable notice and opportunity to be heard, pursuant to chapter 1–26.

Any appeal, pursuant to chapter 1–26, taken from a decision of the Governor or the commission shall be handled as an expedited appeal by the courts of this state.

S.D.C.L. 49–16A–75.

**Commission to promulgate rules for railroad seeking to exercise eminent domain.** The commission shall in accordance with chapter 1–26, promulgate rules:

(1) Establishing a form upon which a railroad may apply for authority to exercise the right of eminent domain;

(2) Specifying the information to be submitted by an applicant; and

(3) Administering applications for authority to exercise the right of eminent domain.

S.D.C.L. 49–16A–75.1

**Railroad carries burden of proof to show public necessity.** The applicant has the burden of proving by a preponderance of the evidence that the exercise of the right of eminent domain is a public use consistent with public necessity.

S.D.C.L. 49–16A–75.2

**Criteria for eminent domain as a public use consistent with public necessity.** A railroad's exercise of the right of eminent domain is a public use consistent with public necessity only if the use of eminent domain:

(1) Has as its purpose providing railroad transportation to shippers in South Dakota for commodities produced, manufactured, mined, grown, used, or consumed in South Dakota;

(2) Is proposed by an applicant with the financial resources necessary to complete the proposed construction or reconstruction along with any related facilities, construction, or mitigation which are necessary to protect against harm to the public safety, convenience, or other adverse socioeconomic or environmental impact, as evidenced by a financing commitment from a lender or an investor or a combination of each with adequate capitalization and resources to fulfill its commitment to build and complete the project;

(3) Is proposed by an applicant who has negotiated in good faith to privately acquire sufficient property without the use of eminent domain;

(4) Is proposed by an applicant who has filed a plat, as required by § 49–16A–64, and that plat sets forth the route of the road to be constructed or reconstructed, identifies each affected landowner, and specifies the location, along with construction methods and engineering specifications for all main lines, sidings, yards, bridges, crossings, safety devices, switches, signals, and maintenance facilities; and

(5) Provides that electric utilities, public utilities, telecommunication companies, and rural water systems have the right to use the right-of-way for the placement of underground facilities, without fee, subject to reasonable regulation as to location and placement.

S.D.C.L. 49–16A–75.3

Kevin Schieffer, the president and chief executor officer of DM & E, testified extensively at the preliminary injunction hearing held in this matter regarding the obstacles that these statutes pose to the PRB project.[1] As CEO of DM & E, Schieffer has been involved in several financing endeavors undertaken by the railroad in the past. He testified that he participated in significant financing projects in 1993 and 1995 and was also active in DM & E's acquisition of two other rail lines. With respect to subparagraph (1) of S.D.C.L. 49–16A–75.3 requiring that the project have the purpose of providing railroad transportation to South Dakota ship-

---

**1.** The testimony Schieffer gave at the preliminary injunction hearing will be considered by the Court in ruling on the permanent injunction although the entirety of the testimony was not repeated at the trial on the merits. *See* Fed.R.Civ.P. 65(a)(2)(" ... evidence re-

ceived upon an application for a preliminary injunction which would be admissible upon the trial on the merits becomes part of the record on the trial on the merits and need not be repeated upon the trial.")

pers, Schieffer testified that the PRB project has no such purpose. Rather, the primary purpose of the PRB project is to provide railroad transportation for coal mined in the Powder River Basin in Wyoming. There would also be an incidental benefit of bettering rail lines in South Dakota for South Dakota shippers.

According to Schieffer's testimony at the preliminary injunction hearing, S.D.C.L. 49–16A–75.3(2)'s requirement of securing a financing commitment prior to applying for eminent domain presents an insurmountable barrier to the PRB project ever going forward. Schieffer testified that the PRB project will cost approximately $2 billion to complete and that no investor will give the project serious consideration if the railroad's authority to use eminent domain is uncertain. Schieffer testified that the financial community needs a level of stability and certainty that the railroad will be able to exercise eminent domain power if necessary before financiers will even consider becoming involved in the project. Schieffer indicated that for an investor or lender to engage in the due diligence required to provide a financing commitment for a project of this size would take countless hours and millions of dollars. Although he admitted that he had not spoken to any potential investors regarding financing for the PRB project, Schieffer stated that investors would not commit that sort of time and financial resources to a project with this level of uncertainty. Even though Schieffer believes that it is unlikely that DM & E will ever need to resort to eminent domain, without authority to do so, DM & E cannot obtain financial backing for the project. As DM & E's counsel pointed out, the issue presents the classic "chicken and the egg dilemma": DM & E cannot satisfy South Dakota's statutory requirements for the exercise of eminent domain because it cannot obtain financing, and DM & E cannot obtain financing because it cannot satisfy the requirements of South Dakota's statute.

Schieffer reiterated the same concerns when he testified at trial. Although he admitted that he was not an expert on financing or investment banking, he stated that he did not believe that it would be prudent for DM & E to seek financing under the circumstances. He testified that, in his view, no railroad project of significant magnitude could be built with the current statutory scheme in effect.

Much of Schieffer's testimony was supported by the testimony of Kurt Feaster, the Chief Financial Officer and Vice President of DM & E. Feaster holds a Masters of Business Administration Degree from the University of Illinois and has worked in the railroad industry for 22½ years. Feaster testified that it would be extremely difficult, but not necessarily impossible, to get a lender invest in the project given the risk that the project may not be completed if eminent domain authority is denied. He stated that this inherent risk makes staged financing not a possibility. He testified that a lender would need assurance that the entire project could be completed before lending any money. Although he recognized that financing commitments are often issued subject to standard conditions, he stated that a condition requiring the acquisition of eminent domain authority is not typical. He testified that such a commitment would be unlike anything he has ever seen. He believed that it would be highly unlikely that the PRB project could advance to the stage of obtaining a commitment letter given the uncertainty created by the statutes and the financial community's lack of tolerance for such a level of uncertainty. Feaster contended that bankers and investors desire to have projects organized in a tight time schedule and prefer to get involved in transactions where things have happened

in a similar fashion in the past. Feaster testified that subdivision (2) of S.D.C.L. 49–16A–75.3 presents such an unknown that it prevents DM & E from starting the project, and he claimed that it would not be prudent for DM & E to engage in the due diligence necessary to meet the requirements of the subdivision.

Feaster stated that DM & E would be required to shoulder the expense of performing the due diligence necessary to prepare a proposal to obtain financing. He explained that DM & E would engage the services of a financial advisor to assist in this process. Such advisors only get compensated for their time if in fact financing is secured for the project. Feaster claimed that the uncertainty created by the South Dakota eminent domain statutes make it less likely that a financing commitment will be obtained thereby increasing the risk of non-payment for the financial advisor. He believed that such a scenario would make it significantly more difficult for DM & E to engage the services of one of the top financial advisors.

Matthew Taylor, a Board member of DM & E and the managing director of Lombard Investments, also testified regarding the burden imposed by S.D.C.L. 49–16A–75.3(2). Taylor has a Masters of Business Administration Degree in finance from the University of San Francisco and has attended the Chartered Analyst Program. He holds a CFA Charter, which is the financing world's equivalent to a CPA. He has been involved in several significant financing projects undertaken by DM & E.

Taylor testified that it would not be prudent for DM & E to seek financing for the PRB project at this time. He stated that DM & E does not have the financial resources to perform the due diligence. He echoed the concern of Schieffer and Feaster that South Dakota's eminent domain statutes create ambiguity and uncertainty making it difficult, if not impossible,

to obtain a financing commitment for the project. He testified that the financial community needs reasonable, although not absolute, certainty that DM & E can obtain eminent domain power if necessary to complete the railroad. He testified regarding the unique nature of railroad projects in that if a single foot of property cannot be obtained, then the entire railroad project cannot be completed. The entirety of the right-of-way is essential in order to build the railroad. In Taylor's opinion, with the South Dakota statutes in place, DM & E will not be able to secure financing for the PRB project.

Schieffer also testified at the preliminary injunction hearing regarding DM & E's decision not to attempt to secure a financing commitment as required by S.D.C.L. 49–16A–75.3(2). Schieffer indicated that to approach potential investors with this level of uncertainty would severely damage DM & E's reputation in the financial community. Schieffer stated that making an attempt to secure financing with the current statutes in place would lead investors to question DM & E's judgment and would in effect poison the well. Schieffer indicated that there are few financial investors willing to get involved in a project of this magnitude and those that are so inclined would not give DM & E another chance to propose the project if DM & E approached them seeking financing under the current circumstances.

Much of the testimony of Schieffer, Feaster and Taylor was contradicted by the testimony of the State's financial expert, Warren Matha. Matha is a finance consultant specializing in structured finance. His central focus is in the area of real estate finance, and he has experience in the acquisition of substantial property and rights-of-way but has no experience in the specific field of railroads. Matha testified that it is commonplace in the financial

community for commitment letters to issue subject to certain conditions, and in his opinion, DM & E could likely obtain a financing commitment to build the PRB project conditioned upon DM & E's acquiring of the right to exercise eminent domain under state law. He recognized, however, that it would be difficult for DM & E to obtain a financing commitment without this condition attached. He also acknowledged that if DM & E were forced to obtain specific authority to condemn each individual parcel of land that it needed to take by eminent domain, such a system would be impractical. He believed that DM & E would need some sort of blanket grant of authority for the project to go forward from a financial perspective.

Matha agreed with the testimony of Schieffer regarding the substantial sum of money required to perform the due diligence necessary to prepare the project. Matha stated, however, that the reason for the high cost was because of the size of the PRB project, not the existence of the South Dakota eminent domain statutes. Matha stated that in order to fund the preparatory work for the project, DM & E would have to look to its traditional sources of capital and that such a loan would be granted based upon the financial fitness of DM & E as a company rather than the fitness of the PRB project. Matha indicated that if DM & E could not secure the funding to perform the due diligence, then the project should not go forward. Matha admitted that he had not reviewed the finances of DM & E and did not know whether they could fund the preparatory work or secure a loan to do so.

Matha also disagreed with Schieffer's testimony regarding DM & E's view that it is imprudent to seek financing under the current conditions. Matha testified that if DM & E were to go out into the market and seek financing, it would not poison the

well. Matha stated that investors know that statutes and regulations are part of doing business in the financial world and that they are willing to work around such obstacles and often do. Unlike the other witnesses that were concerned with the uncertainty created by South Dakota's eminent domain statutes, Matha testified that the fact that the statutes were new and untested would not preclude investors from getting involved in the project. Matha believed that investors would be interested in the PRB project because it is a billion dollar project and there are not many financial opportunities of that magnitude. Such a project represents a potentially high return for investors and thus they would be willing to get involved. Matha stated that projects get "shopped around" a lot and if DM & E is rejected by one lender, it can simply move on and present the project to another.

There was also testimony presented from both sides regarding S.D.C.L. 49–16A–75.3(3)'s requirement that the railroad demonstrate that it negotiated in good faith to privately acquire sufficient property without the use of eminent domain. DM & E introduced evidence through the testimony of Dana Nelson, an assistant to Governor William Janklow, that South Dakota already had statutes in place giving the railroad an incentive to negotiate in good faith with a landowner before pursuing eminent domain. Pursuant to S.D.C.L. 21–35–23, if a railroad fails to negotiate in good faith prior to seeking eminent domain and the judgment awarded at trial is 20% greater than the railroad's final offer, then the railroad is liable to the landowner for costs, attorneys' fees and expert witness expenses.

Schieffer testified that S.D.C.L. 49–16A–75.3(3) does not pose a significant problem for DM & E, and he claims that DM & E has an exemplary reputation in dealing

with landowners. In fact, DM & E hired a consultant team to work with the landowners on the project. Elizabeth Hollmann, one of the consultants, stated that she was proud to be part of DM & E's landowner negotiations. DM & E also established an advisory committee of landowner volunteers to develop a boilerplate offer proposal that addressed the issues raised by landowners.

Schieffer did, however, state that S.D.C.L. 49–16A–75.3(3) places an additional burden upon DM & E and the landowner by adding another level of procedure and thereby adding time and expense for both parties. Under the present system, either the landowner or the railroad has the right to an expedited appeal to the state courts from the decision of the Commission or the Governor. *See* S.D.C.L. 49–16A–75. Under the prior law, if the parties could not reach an agreement regarding the land, then they went directly to court to have the issue decided. Schieffer contends that S.D.C.L. 49–16A–75.3(3) is burdensome to both landowners and the railroad by forcing both parties to go through an administrative process in addition to a likely judicial process upon appeal of the administrative decision.

To support its contention that it treated landowners fairly and negotiated in good faith, DM & E called Robert Hayes to testify. Hayes is a landowner in Wall, South Dakota whose land is affected by the PRB project. Hayes testified that initially he was opposed to the PRB project until he discovered that he would be treated fairly by the railroad. DM & E worked with him regarding his primary concern of access to land for his cattle. Because of the railroad crossing his land, his cattle would not be able to pass from one part of the pasture to the other. In response to Hayes's concern, DM & E built a bridge on his land so that the cattle would have access to more of his land. DM & E also

called David Lewis, another affected landowner. Like Hayes, Lewis was initially opposed to the project. Lewis sought a position on the landowner advisory board in order to look out for his interests. After working with DM & E, Lewis was very pleased. He stated that DM & E addressed all of his issues and that he could not have gotten a better deal.

The State offered witnesses who cast a different light on DM & E's landowner negotiation tactics. Paul Jensen, a rancher near Wasta, South Dakota, testified that although he was not opposed to the railroad and actually rather in favor of it, he was concerned that DM & E intended to build the railroad on hillside shale. Jensen did not believe that the shale was strong enough to support the weight of the railroad and its heavy cargo. DM & E gave Jensen an appraisal for his land but never negotiated the price contained in the appraisal. He believed the appraisal was a take-it-or-leave-it offer and stated that DM & E made it clear that a landowner would get a better price for his land if he supported the project.

Deposition testimony of Keith Anderson was also received into evidence. Anderson is a rancher who lives near Edgemont, South Dakota. Anderson testified that the initial maps provided by DM & E were extremely poor in quality and contained errors making it difficult for the landowner to assess the impact of the project on his land. He requested better quality information from DM & E, which was not provided to him. Eventually, DM & E sent Anderson an appraisal for his land, and Anderson felt that the figure was too low considering that the right-of-way would cut through the center of his ranch creating access problems and also would pass through a spring that he depended upon to water his cattle. When he tried to discuss these concerns with Schieffer,

rather than address Anderson's issues, Schieffer continually inquired whether Anderson was a supporter of the project or opposed to it. From these conversations, Anderson got the distinct impression that the ultimate amount of compensation he would receive was dependent upon whether he supported the project. A few months later, Anderson received an offer from DM & E, but the offer failed to address his concerns and he did not respond to the offer. Anderson testified that he did not feel that DM & E had made a good-faith attempt to negotiate with him because DM & E did not address the issues he had raised.

Ray Gigear, the project engineer for the PRB project, testified at the trial regarding the requirements of S.D.C.L. 49–16A–75.3(4). Gigear has a Bachelor of Science Degree in civil engineering and over 25 years of experience working as a design and construction engineer in the railroad industry. He testified that the PRB is a design-build project and that it will take another nine to eleven months to advance the design to the point where DM & E can begin the design-build procedure. In such a project, Gigear indicated that 20–30% of the project is designed prior to starting construction and that with respect to the PRB project approximately 5–15% of the design is completed at this point. As a result of employing the design-build procedure, Gigear testified that DM & E will not know the identity of all of the affected land-owners at the time it begins construction.

As quoted above S.D.C.L. 49–16A–75.3(4) requires that the project be outlined in great detail from where the switches will be located to the construction methods and engineering specifications for virtually every detail of the entire project. Gigear stated that he has done the preliminary engineering work for the project and has produced several volumes of informa-

tion. He testified, however, that the information DM & E has generated to this point does not meet the requirements of the statute. He indicated that DM & E has not set the construction method for the project nor have the engineering specifications be completed. He does not know the exact location of where the main lines, yards, bridges, crossings, safety devices, switches, signals and maintenance facilities will be located although DM & E does have plans specifying the placement of all of these components. All of the information DM & E has generated is preliminary and subject to change. Gigear testified that based upon the current information he could not verify the truth and accuracy of the application for eminent domain as is required by the regulation implementing the statute. *See* S.D. Admin. R. 70:08:01:02.

Gigear testified that in order to satisfy the statute's requirements, the project would have to be designed 100% prior to construction rather than a design-build project as it is currently planned. According to Gigear, total design to meet the statute's specifications would cost DM & E $30 million or more and would take one and half to two years to complete. He further testified that building a project of this magnitude by totally designing the project first would not be economical because many of the design plans will need to be altered as construction takes place.

Dana Nelson, an assistant to Governor William Janklow, testified regarding the impetus behind S.D.C.L. 49–16A–75.3(5) that requires a railroad that exercises state eminent domain authority provide a free easement over the railroad to public utilities. He testified that rural utility companies were having difficulty acquiring easements over railroad property and were often charged high fees to obtain the easements, a cost that was ultimately passed

on to the consumer. DM & E was not specifically charged with demanding these exorbitant rates. Nelson testified that Burlington Northern had charged several thousands of dollars for easements across its railroad. Nelson stated that the State charges a fee for granting an easement across its railroad property, and the fees charged by DM & E fell in between those of Burlington Northern and the State.

Schieffer testified at trial that DM & E has had no problems in the past with respect to easements on its 700 miles of existing track in South Dakota. He stated that he was concerned that S.D.C.L. 49–16A–75.3(5) could lead to substantial financial expense for DM & E in maintaining records for these free easements. He also indicated reservations about whether the easement holder would be able to utilize the easement in a manner that would interfere with railroad operations. Although the statute does state that the easements are subject to reasonable regulation as to location and placement, it does not specifically state that the easement cannot interfere with the railroad. Schieffer also claimed that the statute creates problems with respect to obtaining financing for the project because the lender will be concerned about the uncertainty generated by this free-for-all system and whether future railroad operations may be affected by the easements and thus less likely to fund the project.

## DISCUSSION

■ "The standard for granting a permanent injunction is essentially the same as for a preliminary injunction, except that to obtain a permanent injunction the movant must attain success on the merits." *Bank One v. Guttau,* 190 F.3d 844, 847 (8th Cir.1999)(citing *Amoco Prod. Co. v. Village of Gambell, Alaska,* 480 U.S. 531, 546 n. 12, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987)). Therefore, the Court is to consider the threat of irreparable harm to

the movant, the balance between this harm and the harm to the other party if the injunction is granted, the public interest, and the merits of the case. *See Dataphase Systems, Inc. v. C.L. Systems, Inc.,* 640 F.2d 109, 113 (8th Cir.1981). The Eighth Circuit has held, however, in cases such as this where the plaintiff is alleging that certain provisions of state law are preempted by federal law and the plaintiff has established that it will suffer irreparable injury if the State is not enjoined from enforcing those provisions, the Court need not weigh the harm to State resulting from granting the injunction nor the public interest involved. *See Bank One,* 190 F.3d at 847–48. In such a situation, the plaintiff will be entitled to a permanent injunction "no matter what the harm to the State, and the public interest will perforce be served by enjoining the enforcement of the invalid provisions of state law." *Id.* at 848.

### A. *Federal Preemption*

■ The federal preemption doctrine is grounded in the Supremacy Clause of the United States Constitution which provides that the "Constitution, and the Laws of the United States which shall be made in Pursuant thereof ... shall be the supreme Law of the Land." U.S. Const. Art. VI, cl.2. Under the Supremacy clause, any state law that contradicts or interferes with an Act of Congress is invalid. *See Cipollone v. Liggett Group, Inc.* 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992). In determining whether state law is preempted by federal law, this Court must look to Congressional intent. *See id.*

■ Three categories of preemption are well-established. First, Congress can expressly preempt state law by passing a statute explicitly stating its intent to do so. *See English v. General Elec. Co.,* 496 U.S. 72, 79, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990). This is known as express preemp-

tion. *See id.* Secondly, Congress may implement a scheme of regulation that so pervasively dominates the field that an intent to occupy the entire field can be inferred and thus no room remains for state regulation. *Id.* Implied or field preemption is the label given to such Congressional action. *Id.* Preemption can also result from a conflict between state and federal law. *Id.*

DM & E argues that the South Dakota statutes at issue are preempted by federal law. The State counters by contending that federal preemption in the area of railroads does not extend into the arena of eminent domain and that a finding of preemption in this context would violate the Tenth Amendment. The Court will address each of the categories of preemption in turn.

### 1. *Express Preemption*

In support of its express preemption argument, DM & E relies upon two federal statutes: the Interstate Commerce Commission Termination Act of 1995 (the "ICCTA") and the Federal Railroad Safety Act of 1970 ("FRSA"). In the context of express preemption, the focal point for analysis is the wording of the preemption clause itself. *See Time Warner Cable v. Doyle,* 66 F.3d 867, 875 (7th Cir.1995). Therefore the Court will examine the preemption clause of each of the relied upon statutes.

■ The ICCTA explicitly grants the Surface Transportation Board exclusive authority over:

> (1) transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and
>
> (2) the construction acquisition, operation, abandonment, or discontinuance of

spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State[.]

49 U.S.C. § 10501(b). The section then goes on to read: "[e]xcept as otherwise provided in this part, the remedies provided under this part with respect to the regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law." *Id.* "Transportation" is broadly defined in the ICCTA to include:

> (A) a locomotive, car, vehicle, vessel, warehouse, wharf, pier, dock, yard, property, facility, instrumentality, or equipment of any kind related to the movement of passengers or property, or both by rail, regardless of ownership or agreement concerning use; and
>
> (B) services related to that movement, including receipt, delivery, elevation, transfer in transit, refrigeration, icing, ventilation, storage, handling, and interchange or passengers and property.

49 U.S.C. § 10102(9). Courts that have construed the ICCTA's preemption clause have interpreted it to be a broad in scope. *See City of Auburn v. United States Government,* 154 F.3d 1025, 1030 (9th Cir. 1998); *Wisconsin Central Ltd. v. The City of Marshfield,* 160 F.Supp.2d 1009, 1013 (W.D.Wis.2000)("It is clear that the ICCTA has preempted all state efforts to regulate rail transportation."); *CSX Transportation, Inc. v. Georgia Pub. Serv. Comm'n,* 944 F.Supp. 1573, 1581 (N.D.Ga.1996). This Court agrees with that conclusion and finds that the ICCTA has preempted all state efforts to regulate railroads. Thus the question then becomes whether South Dakota's eminent domain statutes regulate the DM & E railroad.

In *Wisconsin Central Ltd.,* a Wisconsin district court wrestled with the issue of whether condemnation under state emi-

nent domain statutes constituted regulation. *See* 160 F.Supp.2d at 1013. The dispute in *Wisconsin Central Ltd.* involved the City of Marshfield's attempt to condemn and remove a portion of a railroad passing track in order to realign a state highway. *See id.* at 1011. The court acknowledged that the ICCTA did not define the term "regulation" and relied upon Black's Law Dictionary for the plain meaning of the term as "the act or process of controlling by rule or restriction." *Id.* at 1013. The court went on to reason that condemnation of a passing track certainly exerted control over the railroad, in fact the most extreme type of control, and thus amounted to regulation. *Id.* The court found that the condemnation action brought by the city was preempted by the ICCTA as an attempted regulation of the railroad. *Id.*

The statutes at issue in the instant case do not involve South Dakota's attempt to exercise its eminent domain power over railroad property but rather new statutory requirements that a railroad must meet before it may exercise eminent domain power delegated by the State of South Dakota. Although this distinction is not lost on the Court, the distinction makes little difference in the context of two of the requirements at issue here.

■ S.D.C.L. 49–16A–75.3(2) poses an insurmountable barrier to the PRB project. Based upon the testimony of Schieffer, Feaster and Taylor, DM & E will not be able to obtain a financing commitment as required under S.D.C.L. 49–16A–75.3(2) with the current eminent domain statutes in place. The State's financial expert Matha contended that DM & E could obtain a commitment conditioned upon later acquiring the right of eminent domain. Feaster testified that such a condition is highly unusual, and Taylor flat out stated that with these statutes in place, DM & E cannot obtain a financing commitment, nor

would it be prudent to seek one. Given the fact that Schieffer, Taylor and Feaster have significant combined experience in the railroad industry and financing such project and that Matha has no experience in financing railroad projects, the Court finds the testimony of Schieffer, Feaster and Talyor more persuasive on this point.

Even if the Court were to find Matha's testimony regarding the ability to obtain a conditional commitment persuasive, it is not clear that such a commitment would satisfy the requirements of the statute. As the Court is well aware, financing commitments of this magnitude, those in the billion dollar range, are going to be subject to certain conditions. Feaster testified that a typical condition contained in such commitment letters is that there be no material, adverse change of circumstances. The question is whether such conditional commitments satisfy the statute. As the statute is written the Court must conclude that they do not. The language of the statute requires a "financing commitment from a lender or an investor or combination of each with adequate capitalization and resources to fulfill its commitment to build and complete the project." The statute makes no reference to a conditional financing commitment. Therefore, it is likely that any project of sufficient size to require outside financing would not be able to satisfy the requirement of S.D.C.L. 49–16A–75.3(2). Thus the statute not only blocks the PRB project from going forward, but likewise would likely prevent the construction of any other significant railroad project requiring outside financing given that such a project would only be able to obtain a conditional financing commitment. The Court concludes that since S.D.C.L. 49–16A–75.3(2) completely blocks the project, it exerts enormous control over the railroad which can only be characterized as regulation.

■ The same can be said of S.D.C.L. 49–16A–75.3(4). That provision requiring a very detailed plat to be filed will likewise halt the PRB project. Gigear, the project engineer testified that in order to comply with the statute's requirements, the project would have to be completely designed before construction can begin. DM & E was instead planning on employing a design-build procedure which Gigear testified is more flexible with respect to placement of the track and more economical because it allows for changes in the design as the construction process is begun. Gigear testified that in order to totally design the PRB project it would cost DM & E $30 million dollars or more and would take one and a half to two years to complete. Although the State attempted to demonstrate that DM & E has done significant engineering work and generated much of the information required by the statute, Gigear maintained that the materials DM & E has generated to date do not meet the requirements of S.D.C.L. 49–16A–75.3(4) and that he could not verify otherwise on an application to obtain eminent domain authority. The State offered no contrary testimony.

Therefore, the Court accepts the testimony of Gigear that the only way to satisfy S.D.C.L. 49–16A–75.3(4)'s requirements is to completely design the project. The testimony at trial established that DM & E does not have the few million dollars necessary to perform the due diligence required to obtain financing for the project. Clearly DM & E does not have the $30 million that it would cost to completely design the PRB project nor can it wait the one and a half to two years to begin construction. Based upon the testimony regarding the difficulty of obtaining financing for the PRB project, the Court finds it unlikely that DM & E would be able or even willing to obtain financing to cover the cost of completely designing the project so that it could properly prepare its application for eminent domain. Thus, just as with subdivision (2) of S.D.C.L. 49–16A–75.3, subdivision (4) will wholly prevent the PRB project, and likely any railroad project of significant magnitude, from being built. This Court must conclude that interference to this magnitude by S.D.C.L. 49–16A–75.3(2) & (4) constitutes regulation and is expressly preempted by the ICCTA. Furthermore, examination of the requirements themselves demonstrates the regulatory nature of their effect on the railroad.

■ S.D.C.L. 49–16A–75.3(2) requires that DM & E demonstrate sufficient financial resources to "complete the proposed construction or reconstruction along with any related facilities, construction, or mitigation which are necessary to protect against harm to the public safety, convenience, or other adverse socioeconomic or environmental impact" and provide the State with a "financing commitment letter from a lender or an investor or a combination of each with adequate capitalization and resources to fulfill its commitment to build and complete the project." This requirement necessitates that the Governor consider economic, environmental, and public safety implications of the PRB project. Yet, state regulation of such areas in the context of railroads is preempted by federal law. *See Burlington Northern Santa Fe Corp. v. Anderson,* 959 F.Supp. 1288 (D.Mont.1997) (economic regulation); *City of Auburn,* 154 F.3d at 1031 (environmental regulation); *Wisconsin Central Ltd.,* 160 F.Supp.2d at 1014 (public safety). The State of South Dakota cannot regulate indirectly through the use of its eminent domain power what it cannot regulate directly. To do so would be to allow the State of South Dakota to control a federally approved railroad project, a result that could not be reconciled with the Supremacy Clause.

■ Similar to S.D.C.L. 49–16A–75.3(2), subparagraph (4) of S.D.C.L. 49–16A–75 is regulatory in effect. The provision requires the railroad to file a plat specifying the most minute detail of the project including the construction methods and engineering specifications for every conceivable part of the project. Requiring such a plat in and of itself forces the railroad to design this entire $2 billion dollar project prior to applying for eminent domain authority, and Gigear testified that the project is design build in nature. Thus the South Dakota law is regulating the manner in which the project will be designed. The State has no authority to impose such regulation upon the railroad.

■ In addition to the ICCTA, DM & E also claims that South Dakota's eminent domain statutes are expressly preempted by the Federal Railroad Safety Act of 1970 ("FRSA"). The purpose of the FRSA is to "promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." 49 U.S.C. § 20101. The preemption language of FRSA provides as follows:

> Laws, regulations, and orders related to railroad safety shall be nationally uniform to the extent practicable. A State may adopt or continue in force a law, regulation, or order related to railroad safety until the Secretary of Transportation prescribes a regulation or issues an order covering the subject matter of the State requirement. A State may adopt or continue in force an additional or more stringent law, regulation, or order related to railroad safety when the law, regulation or order—
>
> (1) is necessary to eliminate or reduce an essentially local safety hazard;
>
> (2) is not incompatible with a law, regulation, or order of the United States Government; and

> (3) does not unreasonably burden interstate commerce.

49 U.S.C. § 20106. DM & E argues that since the intent of the statutes at issue is to limit railroad eminent domain to control railroad operations and safety, the legislation is expressly preempted. Yet DM & E did not introduce any evidence to that effect at the preliminary injunction hearing or the trial. The State argued that the intent of the statutes was to protect landowners, not to control railroad operations and provide for public safety. It is true that one of the criteria for the Governor to examine under S.D.C.L. 49–16A–75.3(2) is the harm to public safety, but based upon this lone reference to public safety, the Court cannot conclude that the statutes at issue are expressly preempted by the FRSA.

### 2. Implied (Field) Preemption

As stated above, implied or field preemption exists in those cases in which Congress has enacted a regulatory scheme so pervasive so as to imply that Congress intended to occupy the entire field and leave no room for state regulation. *See English,* 496 U.S. at 79, 110 S.Ct. 2270. The ICCTA presents just such a comprehensive regulatory scheme. *See Soo Line Railroad Co. v. City of Minneapolis,* 38 F.Supp.2d 1096, 1100 (D.Minn.1998)(ICCTA pervasively dominates the field of public health, safety, environment, and historic preservation with respect to railroads). When the ICCTA was enacted, Congress removed provisions in the former law giving the state a role in regulation of railroads. The Staggers Act, the precursor to the ICCTA, provided for a federal certification procedure for states that wanted to regulate intrastate railways. *See Southern Pacific Transp. v. Public Utilities Comm'n,* 716 F.2d 1285, 1287 (9th Cir. 1983). The ICCTA repealed these sections in addition to withdrawing the state's

jurisdiction over wholly intrastate tracks. Congress also chose to delete a policy statement concerning regulatory cooperation between state and federal authorities and another policy statement providing for joint state-federal regulatory bodies. *See* S.Rep. No. 176, 104th Cong., 1st Sess. 44 (1995). The clear message of the ICCTA is that there is no longer a place for states in the area of railroad regulation.

██ Although it is clear that the area of railroad regulation is now off limits to the state, the area of eminent domain presents a more complex question. As the state properly pointed out, the STB's own position with respect to DM & E's eminent domain authority is that the question presents an issue of state law. The STB has acknowledged that it does not have a role to play in eminent domain proceedings and that DM & E is responsible for the acquisition of the land necessary to complete the project. Thus STB approval of the PRB project does not carry with it any federal power to take land to complete the project. For such authority, DM & E is wholly dependent upon the State of South Dakota. Therefore, the Court finds that Congress did not intend to preempt the field of eminent domain in enacting the ICCTA. This finding, however, does not conclude the inquiry of whether the particular statutes at issue are preempted. As the Court stated above, two of the provisions of S.D.C.L. 49-16A-75.3 are regulatory in nature.

The Court finds that S.D.C.L. 49-16A-75.3(2) & (4) have only a tenuous connection to a delegation of eminent domain power and instead attempt to regulate railroads. The State claims that S.D.C.L. 49-16A-75.3(2) is a proper condition on eminent domain authority because in requiring that the railroad produce a financing commitment evidencing that it can complete the project, the State ensures that the railroad has the necessary resources to compensate the landowner for the taking and also that the taking will not be for naught because the project can be completed. These are proper concerns of the State, but the State reaches too far into areas regulated by federal law to address these issues. As stated earlier, the State does not have a place in regulating economic and environmental aspects of railroads, nor does it have authority to regulate public safety with respect to railroads. Congress has preempted these fields. By requiring the Governor to examine these aspects of the project in the context of determining financial feasibility, the State is implying that the Governor has authority to require additional safety measures or environmental mitigation on top of that required by the STB. Such power amounts to regulation of the railroads and is prohibited. A similar analysis applies with respect to S.D.C.L. 49-16A-75.3(4).

In subparagraph (4) of S.D.C.L. 49-16A-75.3, the State claims that it is examining the details of the construction project to ensure that no more land than is necessary to complete the project is taken. The State further claims that it needs to know the specifics of the methods of construction because different methods impose different burdens upon the land taken as well as on the land adjacent to the property taken. Again, these are issues in the context of eminent domain that the State has a legitimate interest in, but the state attempts to accommodate that interest by burdening the railroad with a very heavy regulatory requirement. In forcing DM & E to design the entire project prior to applying for eminent domain authority, the State is exerting control over the railroad that can only be referred to as significant regulation. In addition, the record is clear on the point that such detailed advanced plans would have to be altered in the course of construction. Further regulatory approval would apparently have to be obtained from

the State for each of the changes to the pre-approved construction plans. By indirectly regulating the railroad via its eminent domain power, the State of South Dakota has entered a field exclusively occupied by Congress in passing S.D.C.L. 49–16A–75.3(2) & (4). *See Wisconsin Central Ltd.,* 160 F.Supp.2d at 1014 (state condemnation law cannot be used to condemn railroad because Congress preempted the field). Furthermore, many of the specific areas addressed in those two provisions mirror the areas examined by the Surface Transportation Board in its investigation of the project, such as financial viability of the project, environmental consequences, and the location of the track. Regulation of these are areas belongs solely to the federal government.

DM & E also contends that S.D.C.L. 49–16A–75.3(5) requiring the railroad to provide a free easement to utility companies is preempted by federal law. DM & E argues that the State cannot regulate the location and placement of utility easements within a railroad right-of-way because such regulation violates the preemption clause of the ICCTA. *See* 49 U.S.C. § 10501(b). DM & E asserts that the forced placement of utilities on railroad property will inevitably result in conflict between the railroad and such utilities. In its post-trial brief, the State has not responded to this argument of DM & E.

To support its contention that S.D.C.L. 49–16A–75.3(5) is preempted by federal law, DM & E relies on two cases. In *Mellon v. Southern Pacific Transport Co.,* 750 F.Supp. 226 (W.D.Tex.1990), the landowner of a servient estate crossed by a railroad challenged the railroad's granting of an easement for installation of cable beneath the railroad's right-of-way without compensating the servient owner. The landowner argued that Texas law, which is more restrictive than federal law on the rights of railroads and telecommunications companies, should apply to his claims. *Id.* at 232. The court recognized that Congress had passed a statute specifically authorizing "railroads to enter into contracts with telephone, telegraph and cable companies to exchange services." *Id.* (*citing* 49 U.S.C. § 10749). The court, however, also noted that the Congressional statute failed to directly address the issue of railroad rights-of-way. *Id.* at 232. Thus, the court found that it was dealing with a field preemption scenario and went on to hold that federal law occupies the entire field of railroad right-of-ways as to preclude application of state law. *Id.* at 232–233.

The second case relied upon by DM & E presents a very different circumstance. *Railroad Ventures, Inc. v. Surface Transportation Board,* 299 F.3d 523 (6th Cir. 2002), concerns an appeal from a decision of the Surface Transportation Board invalidating an agreement entered into between a township and the owner of the railroad. After filing an abandonment petition with the STB seeking permission to abandon the line, the owner of the railroad entered into an agreement with a township providing that the railroad or its successor in interest would construct an overpass or underpass at a crossing between the railway and the highway as a precondition to the restoration of rail service. *Id.* at 538. The party attempting to purchase the railroad in order to keep it operational argued that enforcement of the agreement would likely cause it to forgo the acquisition of the rail line because the estimated cost of constructing an overpass or underpass would exceed the net liquidation value of the entire line. *Id.* at 540. The STB agreed and found that the agreement unreasonably interfered with common carrier operations and the statutory provisions providing for offers of financial assistance to avoid abandonment of rail lines. *Id.*

The Sixth Circuit upheld the decision of the STB citing three separate grounds for its decision. First, the court found that the seller had no right to transfer any property interest associated with the rail line after it had filed its abandonment petition with the STB. *Id.* at 561. The court also held that public policy supported the STB's decision because the agreement entered into between the seller and the township impeded the restoration of rail service along the line in question. *Id.* And finally, the court upheld the decision on grounds of federal preemption. The seller and the township had argued that they entered into the agreement in order to comply with Ohio laws regarding health and safety. The court found that these Ohio state laws had been preempted by the ICCTA to the extent that the Ohio laws "intrude upon the jurisdiction of the STB with regard to the regulation of rail transportation under § 10501(b)." *Id.* at 561. The court fails to make clear in its opinion precisely which portion of § 10501(b) the Ohio laws intrude upon, but presumably it is that portion of the statute vesting the STB with exclusive jurisdiction over the abandonment of railroads.

 Unlike in the two cases cited by DM & E in which the railroad voluntarily gave the easement and then was challenged for doing so, here the statute at issue requires DM & E to provide the easement free of charge to certain entities subject to reasonable regulation from the state as to location and placement. The issue for the Court to determine is whether such a requirement as a condition on the right to obtain state eminent domain authority is preempted by federal law. The Court finds that it is not. It is clear that the authority of the STB does not extend into the area of eminent domain, although it clearly has exclusive jurisdiction over the construction of railroads. *See* 49 U.S.C. § 10501(b)(2). Requiring an easement over a portion of a railroad and regulating its location and placement clearly impacts the railroad, but the State is not dictating the manner of construction of the railroad. The statute only deals with the placement of the easement, not the railroad itself. The instant case does not concern a contract entered into between the railroad and the easement holder and thus does not fall under the provisions of 49 U.S.C. § 10749 like *Mellon.* Furthermore, unlike in *Railroad Ventures, Inc.,* there is no evidence that requiring the easement will make the PRB project financially unfeasible and thus halt construction. In requiring the right-of-way, the State has not delved into an area preempted by the ICCTA.

### 3. *Conflict Preemption*

 Conflict preemption exists where "it is impossible for a private party to comply with both state and federal requirements, . . . or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *English,* 496 U.S. at 79, 110 S.Ct. 2270. The ICCTA was passed to deregulate the railroad industry and foster competition in the industry. *See CSX Transportation, Inc.,* 944 F.Supp. at 1583 (citing S.Rep. No. 176, 104th Cong., 1st Sess. 3 (1995) and 49 U.S.C. § 10101). Although it may be theoretically possible for DM & E to comply with the ICCTA and the accompanying regulations of the Surface Transportation Board as well as S.D.C.L. 49–16A–75.3(2) & (4), such a burden on DM & E would clearly undercut Congress's intent to relieve the railroad industry from heavy regulatory burdens. S.D.C.L. 49–16A–75.3(4) requires that DM & E file a "plat that sets forth the route of the road to be constructed or reconstructed, identifies each affected landowner, and specifies the location, along with construction methods and engineering specifications for all main lines, sidings,

yards, bridges, crossings, safety devices, switches, signals, and maintenance facilities." Requiring such minute detail for the construction of a two billion dollar design-built project is a virtual impossibility and insurmountable regulatory burden. Likewise, the requirement of a financing commitment found in S.D.C.L. 49–16A–75.3(2) imposes a significant burden on DM & E and conflicts with Congress's desire to deregulate railroads, especially in light of the fact that the Surface Transportation Board has already found the PRB to be a financially viable project. Therefore, these two provisions of S.D.C.L. 49–16A–75.3 also run afoul of the principal of conflict preemption.

In an attempt to dispose of the remainder of S.D.C.L. 49–16A–75.3's requirements, DM & E argues that South Dakota's conditioning the railroad's exercise of eminent domain upon a finding a public use consistent with public necessity conflicts with the ICCTA's requirement that the STB make a finding of public convenience and necessity prior to issuing a certificate of authorization. DM & E argues that S.D.C.L. 49–16A–75.3's entire purpose of defining public use consistent with public necessity is thus preempted and the entire statute is void. The Court cannot agree.

DM & E is correct in that 49 U.S.C. § 10901(b) requires that the STB "issue a certificate authorizing activities for which such authority is requested in an application filed ... unless the Board finds that such activities are inconsistent with the public convenience and necessity." This language, however, does not lead to the conclusion that any South Dakota eminent domain law requiring a showing of public use and necessity is contradictory. The Court's analysis must be guided by the basic premise that the touchstone of preemption analysis is an examination of Congressional intent. *See Cipollone,* 505 U.S.

504, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992). Thus, the question becomes whether Congress intended to preempt a state's right to condition an exercise of state eminent domain power upon a finding by the state of public use and necessity. The answer to that question is no.

■ The ICCTA does not speak of eminent domain. A finding by the STB of public convenience and necessity does not vest the railroad with any power to use that specific route so approved because the certificate of authorization comes with no accompanying condemnation power. As stated above, the Final Environmental Impact statement issued by the STB clearly recognizes that the area of eminent domain is controlled by state law, that the Board is not involved in such proceedings, and that it is the responsibility of DM & E to acquire to the land necessary to build the railroad. In DM & E's case, the condemnation power comes solely from the state. This Court will not lightly infer a Congressional intent to preempt the ability of a state to condition the exercise of state eminent domain power upon the black letter law requirement of public use when Congress did not explicitly say so. If Congress would have intended to supplant such a basic state power, it could have delegated its own eminent domain power or made the preemption of state eminent domain law express in nature. Accordingly, it is the finding of this Court that only those provisions of South Dakota law that are clearly regulatory in nature, S.D.C.L. 49–16A–75.3(2) & (4), are preempted by federal law.

### 4. *10th Amendment*

The State argues that in order for federal law to preclude the State from setting conditions for the private exercise of its eminent domain power, one must assume a federal mandate for the State to legislate

in a particular manner and that such a mandate would violate the Tenth Amendment. The Court disagrees. The primary case relied upon by the State is easily distinguishable. In *New York v. United States*, 505 U.S. 144, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992) at issue was the Congressional Low–Level Radioactive Waste Policy Amendments Act enacted to combat the problem of a lack of disposal sites for such waste. *See id.* The Act had numerous provisions providing incentives to the states for addressing the problem, only one of which was found to be unconstitutional. The Court found that the provision requiring that states either take title to the radioactive waste within their respective jurisdictions or regulate in the area in accordance with Congress's instructions to be a violation of the Tenth Amendment. The Court held that Congress was unconstitutionally coercing the states into complying with Congressional objectives. *Id.* at 175, 112 S.Ct. 2408. The Constitution did not grant Congress the authority to require states to take ownership of radioactive waste from generators of such waste nor did it grant Congress the power to command state governments to implement legislation enacted by Congress. *Id.* at 175–176, 112 S.Ct. 2408. Therefore, the Court concluded that the choice between two unconstitutional alternatives made the provisions as a whole no more constitutionally sound, and the Court struck it down as violative of the Tenth Amendment.

The situation posed by the instant case is very different from that present in *New York v. United States.* Here, the federal government is not commandeering the State of South Dakota in any sense of the word. The federal government is not forcing South Dakota into enforcing a federal regulatory program. South Dakota made a choice to delegate its eminent domain power to the railroad. Just as any other state law, such a delegation of state power cannot run afoul of federal law, for the

Supremacy Clause will not allow it. Thus, the requirements as well as restrictions placed upon South Dakota's delegation of its eminent domain power cannot allow the State to have a say in those areas of the law preempted by federal law and therefore off limits to the states. The Tenth Amendment presents no barrier to such a finding.

### B. *Irreparable Harm*

▮▮▮▮▮ In addition to establishing federal preemption of the South Dakota statutes at issue, DM & E must also demonstrate irreparable harm. *See Bank One, Utah v. Guttau,* 190 F.3d 844, 847, 848 (8th Cir.1999). The State argues that irreparable harm is not present because any damages suffered by DM & E can be compensated by money. This argument rings hollow. Since the instant action is one against the State, money damages are not recoverable. The threat of unrecoverable economic loss does qualify as irreparable harm. *See Baker Elec. Coop., Inc. v. Chaske,* 28 F.3d 1466, 1473 (8th Cir.1994). Furthermore, monetary damages may constitute irreparable harm when one's allegedly unlawful actions are so substantial as to threaten "the very existence of the [petitioner]'s business." *Packard Elevator v. I.C.C.,* 782 F.2d 112, 115 (8th Cir.1986) (citations omitted). The evidence before the Court establishes that the PRB project cannot move forward with the current statutory scheme in place. Schieffer testified at the preliminary injunction hearing that if the project is not put into motion soon, it will most likely never be built. Without the PRB expansion, Schieffer stated that the long term future of DM & E railroad is uncertain. Thus the Court finds that the harm at issue is sufficiently serious as to jeopardize the very existence of the DM & E railroad, and that finding coupled with the fact that a monetary award is not recoverable, leads to Court to

conclude that DM & E has demonstrated irreparable harm.

Although the Court's analysis need go no further in order to grant DM & E's motion for a permanent injunction with respect to S.D.C.L. 49–16A–75.3(2) & (4), which are preempted by federal law [2], the Court will analyze DM & E's other bases for relief to determine whether DM & E is entitled to a permanent injunction on any of the other grounds advanced with respect to either those provisions preempted by federal or the other challenged provisions. Therefore, the Court will go on to consider the other *Dataphase* factors.

### C. *Balance Between the Harm Alleged and the Injury Resulting from an Injunction*

In weighing the balance of the harms, the Court finds that the balance weighs in favor of granting DM & E the injunction. The harm to DM & E if the injunction is not granted could be devastating. With the statutes in place, the evidence establishes that the PRB project will not be built. As stated above, without this project, DM & E's long-term viability is in question.

The injury to the State of granting the injunction is minimal. Schieffer testified at the preliminary injunction hearing that DM & E has no current plans to use eminent domain and plans to do everything possible to avoid having to resort to such power. If DM & E must resort to exercising eminent domain power in order to complete the PRB project, the prior procedures in effect under S.D.C.L. 21–35 as well as S.D.C.L. 49–16A–75, 49–16A–75.1 and 49–16A–75.3(3) are sufficient to protect the State's interest in protecting landowner's rights. Thus, the balance of the harms weighs in favor of DM & E.

### D. *Success on the Merits*

#### 1. *Dormant Commerce Clause*

Pursuant to the Commerce Clause of the United States Constitution, Congress has the power "[t]o regulate Commerce ... among the several states." U.S. Const. art. I, § 8, cl. 3. The Supreme Court has held that this power also contains negative implications that restrict the states' power to regulate interstate commerce even in the absence of Congressional legislation in a particular area. *See CTS Corp. v. Dynamics Corp. of America,* 481 U.S. 69, 87, 107 S.Ct. 1637, 95 L.Ed.2d 67 (1987). This negative implication flowing from the Commerce Clause has been termed "dormant Commerce Clause." Analysis under the dormant Commerce Clause takes one of two tracks depending on whether the law at issue discriminates against interstate commerce. " 'Discrimination' for purposes of the Commerce Clause means 'differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter.' " *Ben Oehrleins & Sons & Daughter v. Hennepin County,* 115 F.3d 1372, 1383 (8th Cir.1997)(quoting *Oregon Waste Sys. Inc. v. Department of Envtl. Quality,* 511 U.S. 93, 99, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994)). "A state law may discriminate against interstate commerce on its face, in its purpose, or in its effect." *Id.*(citation omitted). "[I]f the law in question overtly discriminates against interstate commerce, [the Court] will strike the law unless the state or locality can demonstrate, 'under rigorous scrutiny, that it has no other means to advance a legitimate local interest.' " *Id.* (quoting *U & I Sanitation v. City of Columbus,* 205 F.3d 1063, 1067 (8th Cir.2000)). In cases in which the law does not overtly discriminate against

---

**2.** As stated above, under the Eighth Circuit precedent in *Bank One, Utah v. Guttau,* 190 F.3d 844, 847, 848 (8th Cir.1999), once the Court has found irreparable harm and federal preemption, the Court need not consider the other *Dataphase* factors.

interstate commerce but rather regulates commerce in an evenhanded manner, the law will be stricken only if "the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970).

DM & E argues that S.D.C.L. 49–16A–75 through 49–16A–75.3 discriminate against interstate commerce and are subject to strict scrutiny analysis. DM & E contends that the purpose of these statutes is to control the expansion of railroads in South Dakota and to discriminate against larger projects in interstate commerce. The State contends that the statutes at issue do not discriminate against interstate commerce and should be judged under the more lenient *Pike* balancing test. The Court finds the State's position more persuasive on this point.

The statutes at issue do not treat instate and out-of-state interests differently. As the state correctly asserts, all railroads seeking to use eminent domain, regardless of whether they are from South Dakota or other states or whether they will have an interstate or wholly intrastate project are subject to the requirements of S.D.C.L. 49–16A–75 through 49–16A–75.3. The Supreme Court has held, however, that laws that impose equal burdens on interstate and intrastate activities are not immune from dormant commerce clause challenges if in fact the laws discriminate against interstate commerce. *See C & A Carbone, Inc. v. Town of Clarkstown,* 511 U.S. 383, 390–91, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994).

At issue in *Carbone* was a flow control ordinance that required all solid waste to be processed at a designated transfer station before leaving the municipality. *Id.* at 386, 114 S.Ct. 1677. The Court held that although the requirement of utilizing the local processor applied equally to in-state and out-of-state producers, it discriminated against interstate commerce because it deprived out-of-state businesses access to a local market. *Id.* at 389, 114 S.Ct. 1677. The Court went on to state "[t]he central rationale for the rule against discrimination is to prohibit state or municipal laws whose object is local economic protectionism, law that would excite those jealousies and retaliatory measures the Constitution was designed to prevent." *Id.* at 390, 114 S.Ct. 1677.

The instant case is distinguishable from *Carbone* in that the South Dakota's eminent domain statutes do not deprive instate or out-of-state railroad companies of any opportunity or advantage that is granted to local entity. Rather, the statutes erect universal criteria that apply to all railroads seeking to acquire eminent domain authority under South Dakota law. The only protectionist element of S.D.C.L. 49–16A–75 through 49–16A–75.3 is that the laws were purportedly enacted to protect the rights of South Dakota land-owners. This type of protectionism, however, does not lead to any finding of discrimination against interstate commerce because it does not purport to protect in-state interests at the expense of out-of-state interests. It merely protects in-state landowners from abuse by in-state or out-of-state railroads of a state delegated power. Such a scenario has no discriminatory impact on out-of-staters.

DM & E's claim that the statutes are the State's attempt to control interstate railroad expansion and thus are discriminatory is unsupported. Clearly, South Dakota, although it may regulate the private use of eminent domain within its borders, cannot project its legislation into other states. *See Brown–Forman Distillers Corp. v. New York State Liquor Authority,* 476 U.S. 573, 582–83, 106 S.Ct. 2080, 90 L.Ed.2d 552 (1986)(finding that New York

could regulate the sale of liquor within its borders and seek low prices for its residents but could not project its legislation into other states by in effect regulating the price to be paid for liquor in other states). DM & E has failed to establish that South Dakota's eminent domain statutes have an extra-territorial reach. There was no evidence to establish that DM & E cannot simultaneously comply with the requirements of the South Dakota statutes and those of other states through which it plans to construct its railroad. DM & E has simply failed to point to an out-of-state interest that is burdened by the statutes at issue and thus cannot establish that the statutes discriminate against interstate commerce. Therefore, the statutes at issue will be primarily analyzed under the *Pike* balancing test rather than the more rigorous scrutiny applied to laws that overtly discriminate against interstate commerce. The one instance in which strict scrutiny will be applied is in the analysis of S.D.C.L. 49–16A–75.3(1).

 Subsection (1) of S.D.C.L. 49–16A–75.3 falls into the category of statutes that overtly discriminate against interstate commerce and thus can only be upheld if it can withstand rigorous scrutiny. S.D.C.L. 49–16A–75.3(1) states that the "exercise of the right of eminent domain is a public use consistent with public necessity only if the use of eminent domain has as its purpose providing railroad transportation to shippers in South Dakota, for commodities produced, manufactured, mined, grown, used, or consumed in South Dakota." This provision purposefully discriminates against out-of-state commerce on its face. It is protectionist in nature in that it requires that the purpose of the exercise of eminent domain "only" has as its purpose to benefit South Dakota interests. It does not require that South Dakota interests be on par with the interests of shippers in other states. Instead it requires that the sole purpose of the project be to provide railroad transportation for South Dakota shippers for products having a significant connection to South Dakota. Such an economic protectionist stance is precisely what is forbidden by the dormant Commerce Clause. *See Brown–Forman Distillers Corp. v. New York State Liquor Authority,* 476 U.S. 573, 580, 106 S.Ct. 2080, 90 L.Ed.2d 552 (1986)(citing *Philadelphia v. New Jersey,* 437 U.S. 617, 624, 98 S.Ct. 2531, 57 L.Ed.2d 475(1978)).

The State contends that S.D.C.L. 49–16A–75.3(1) advances the legitimate state purpose of providing adequate shipping capacity, both intrastate and interstate, for South Dakota products. The State argues that conditioning the ability to use South Dakota's eminent domain power on an agreement to provide shipping to South Dakota products is a minimally restrictive way to achieve that purpose. DM & E contends that the State cannot establish that S.D.C.L. 49–16A–75.3(1) is the least restrictive means to advancing its legitimate end. The Court agrees with DM & E on this point. A less restrictive means for the State to provide for shipping of South Dakota products would be to require that the project at issue have the incidental benefit of providing for such shipping rather than that the project have as its sole purpose to benefit South Dakota shippers and products. Thus, the Court finds that S.D.C.L. 49–16A–75.3(1) is unconstitutional as violative of the dormant Commerce Clause. The fact of some incidental benefit to South Dakota shippers does not detract from this conclusion.

 S.D.C.L. 49–16A–75 provides that the Governor, or at the Governor's direction, the commission will determine whether a railroad's exercise of eminent domain is a public use consistent with public necessity. DM & E contends that the process and the criteria incorporated in the statute have a discriminatory effect.

The implementing regulations require that "[a] separate determination shall be made with respect to each landowner from whom the railroad seeks to acquire land by the exercise of the power of eminent domain." S.D. Admin. R. 70:08:01:04 (1999). DM & E claims, and the trial testimony supports, that requiring an individual determination for each parcel of land rather than approving the entire PRB project as a whole presents a significant difficulty with respect to obtaining financing for the project.

Although South Dakota Administrative Regulation 70:08:01:04 does require that a separate determination be made with respect to each parcel of land sought to be acquired by eminent domain, the regulations do not appear to require the filing of a separate application each time. Pursuant to South Dakota Administrative Regulation 70:08:01:03, the application must include a description of the entirety of the proposed project and identify each affected landowner, not just those against whom eminent domain power is sought to be used. The regulation requires that additional information be provided in the application with respect to each landowner whose property the railroad seeks to take by eminent domain authority. Thus, presumably, DM & E would only have to go through the process of filing a detailed application once and identify the each of the affected landowners whose property it seeks to take via eminent domain authority. Then the Governor or the Commission would make an individual determination with respect to each parcel of land sought to be taken by eminent domain.

Therefore, the question becomes whether the burden imposed upon interstate commerce by the requirement of a individualized determination made by either the governor or the commission is clearly excessive in relation to the local benefit advanced by the requirement. The State clearly has a legitimate interest in ensuring that private use of public eminent domain authority is employed for the public good and consistent with public necessity. Requiring such a showing by the railroad with respect to each parcel sought to be taken by eminent domain advances that interest and protects the rights of each individual landowner. Against this public benefit, the Court must balance the burden imposed upon interstate commerce. DM & E introduced testimony that the level of uncertainty created by the individualized determination will present significant problems for the financial community in evaluating and deciding whether to support the project. The State's own financial expert, Warren Matha, testified that if DM & E had to get specific authority to condemn each individual parcel, it would be impractical and that some sort of blanket grant of eminent domain authority would be necessary to allow the project to go forward in obtaining financing. Furthermore, the testimony of the PRB project engineer, Gigear, established that at the time that DM & E begins construction of the railroad, it will not know the identity of each affected landowner because the location of the line may change.

Based on this evidence, the Court finds that South Dakota Administrative Regulation 70:08:01:04 which requires a separate determination be made with respect to each parcel excessively burdens intestate commerce. The uncontroverted evidence established that the regulation's individual determination requirement would prevent the project from finding financial support and thus prevent the PRB project from being built. The State can ensure that its eminent domain power is used for the public and consistent with public necessity by less burdensome means. For instance, it could require a finding that the proposed project, rather than each proposed parcel to be taken, is for the public use and

consistent with public necessity. Therefore, the Court finds that the regulation violates the dormant Commerce Clause.

The statute S.D.C.L. 49–16A–75 itself, however, suffers from no constitutional infirmity. As stated above, the State has a legitimate interest in protecting landowners and ensuring that private use of eminent domain advances the public good. DM & E has not established that merely allocating such a determination of public use and necessity to the Governor or the Commission unduly burdens interstate commerce. DM & E has argued that placing the power in the hands of the Governor or the Commission to determine public use and necessity creates uncertainty in the process that could lead to potential problems with obtaining financing. The Court finds, however, that the evidence established that the real problem with the statutory scheme were the criteria that need be satisfied in the application and the individualized determination for each parcel of land. S.D.C.L. 49–16A–75 contains none of these problematic provisions. Therefore, although the implementing regulation S.D. Admin. R. 70:08:01:04 must be invalidated, the statute stands.

S.D.C.L. 49–16A–75.1, requiring the commission to promulgate rules to govern eminent domain applications, and S.D.C.L. 49–16A–75.2, requiring that the railroad shoulder the burden of establishing public use and necessity, are not individually challenged by DM & E as to their burden on interstate commerce. Rather DM & E contends that both statutes are integral parts of a regulatory scheme intended to discriminate against interstate commerce by controlling the PRB project. The Court, however, has already rejected the notion that these statute are discriminatory in purpose.

DM & E also asserts that S.D.C.L. 49–16A–75.2 excessively burdens interstate commerce by requiring an up-front investment of significant time and expense to meet the burden of proof. Again, DM & E focuses on the burden imposed by the parcel-by-parcel approach taken by South Dakota Administrative Regulation 70:08:01:04. The railroad contends that the requirement that the railroad meet the burden of proof for each individual landowner for whom eminent domain authority may be sought gives rise to a requirement that significant engineering and design work be completed prior to obtaining financing for the project. South Dakota Administrative Regulation 70:08:01:03 lists the information that must be included in the eminent domain application. In addition to other requirements, this list includes:

(6) The estimated cost of construction or reconstruction to build and complete the project, including any related facilities and construction or mitigation measures necessary to protect against harm to the public safety and convenience, including any socioeconomic or environmental impacts;

(7) A copy of any documentation that evidences a financing commitment from a lender or investor, or both, with adequate capitalization and resources necessary to fully cover the costs described in subdivision (6);

(8) A copy of the plat filed in accordance with SDR 49–16A–64 with attached appendices showing the route of the road to be constructed or reconstructed, the identity of each affected landowner, and the location, along with the construction methods and engineering specifications for all main lines, sidings, yards, bridges, crossing, safety devices, switches, signals, and maintenance facilities . . .

*See* S.D. Admin. R. 70:08:01:03 (1999).

DM & E is correct in its contention that in order to apply for eminent domain

authority, it must invest significant sums of money into advancing its design so that it could say for certain what the engineering specifications and construction methods will be and which portions of land will be affected. Without the authority to exercise eminent domain, DM & E cannot obtain a financing commitment. Without financing DM & E cannot advance the project to the stage necessary to meet the applications requirements. Even if DM & E could self-finance or find capital to invest in the project in order to get it to a stage were it could detail the application's requirements, DM & E still could not satisfy the application requirement that it provide evidence of a financing commitment from a source with resources sufficient to complete the proposed project. The testimony at trial established that with the current statutory scheme in place, DM & E cannot obtain a financing commitment.

■ Therefore, the problem is not S.D.C.L. 49–16A–75.2 and its allocation of the burden of establishing public use consistent with public necessity to the railroad, but rather that a project of this magnitude cannot proceed by individualized determination with respect to each parcel of land after the filing of an extremely detailed application for which much of the necessary information is unknown to the railroad. These burdensome requirements are imposed by the implementing regulations. The necessary expenditures to advance the PRB project to the stage whether DM & E can submit an application and attempt to carry its burden is simply too great. DM & E does not have the necessary finances to accomplish this; nor with the degree of uncertainty surrounding eminent domain authority is DM & E likely to find a source to put up the money to get DM & E to the application stage. The burden imposed upon interstate commerce by South Dakota Administrative Regulations 70:08:01:03 and

70:08:01:04 is excessive. These two regulations would prevent the project from being built. Surely, the State can advance its legitimate interest with less onerous requirements.

■ Again, the Court is presented with a situation in which the statute under challenge can survive a constitutional attack on dormant Commerce Clause grounds, but the implementing regulations cannot. The Court finds that S.D.C.L. 49–16A–75.2 does not place an undue burden upon interstate commerce. The statute merely places the burden of proof for establishing public use consistent with public necessity on the railroad. The allocation of the burden of proof in and of itself does not burden interstate commerce or prevent the railroad from being built. It is, as stated above, the detailed requirements of the application and the parcel-by-parcel determination that poses significant burdens on interstate commerce. Therefore, the Court finds that S.D.C.L. 49–16A–75.2 is constitutional.

In evaluation of S.D.C.L. 49–16A–75.3, the Court has already found subparagraph (1) to be unconstitutional in light of the fact that it discriminates against interstate commerce. As stated above, the Court will analyze the remaining provisions of S.D.C.L. 49–16A–75.3 under the less rigorous *Pike* balancing test. Under this test, the Court must determine "whether the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits." *Pike*, 397 U.S at 142, 90 S.Ct. 844. Through this lens, the Court will first examine S.D.C.L. 49–16A–75.3(2) which requires that the railroad demonstrate that it has the financial resources necessary to complete the proposed project by producing a financing commitment from a lender or investor with adequate capitalization and resources to fund the project.

DM & E claims that S.D.C.L. 49–16A–75.3(2) has barred the PRB project from going forward. Schieffer, Feaster and Taylor testified that DM & E cannot obtain a financing commitment for the PRB project unless it can show potential investors that it can utilize eminent domain if necessary. In order to perform the due diligence necessary to make a proposal to a potential investor or lender, DM & E would need to spend significant time and millions of dollars. Taylor testified that DM & E does not have the financial resources to invest in completing this expensive preparation work. Furthermore, Feaster testified that it is far from certain the if DM & E took on the expense of performing the due diligence that a financial commitment would be forthcoming from a lender. He believed it to be highly unlikely that DM & E could get to the stage of obtaining a financing commitment, although not necessarily impossible. Taylor testified that it would not be prudent to even seek a financing commitment with the current eminent domain statutes in place. DM & E's witnesses stated that the financial community needs a level of certainty and stability before it will get involved in a project, and because of South Dakota's unique eminent domain statutes as they relate to railroad takings, there is no such certainty and stability. DM & E further contends that the state's purpose in protecting landowners and ensuring that the railroad can be completed can be met by less burdensome methods such as reclamation requirements, bonding, and existing eminent domain laws which will not create an unacceptable level of uncertainty for the financial community.

The State argues that S.D.C.L. 49–16A–75.3(2) does not unduly burden interstate commerce, but rather simply requires the railroad to demonstrate that they have sufficient financial resources available to complete the proposed project prior to obtaining eminent domain. The State asserts that the requirement serves the legitimate state purpose of preventing construction projects from commencing without sufficient financial backing to protect the landowner's right to compensation and to ensure that the project can be completed. The State contends that the statute's requirement can be met by a conditional financing commitment, and the State's financial expert, Warren Matha, testified that DM & E should be able to obtain such a commitment with the current statutory scheme in place. Therefore, the State claims that S.D.C.L. 49–16A–75.3(2) places a minimal burden on interstate commerce that is not outweighed by the local benefit of the statute.

The Court finds that the burden imposed upon interstate commerce by S.D.C.L. 49–16A–75.3(2) is weighty. The Court is persuaded by the testimony of Taylor and Feaster regarding the feasibility of obtaining a financing commitment for a project of this magnitude under the current conditions. Matha's experience is in the area of structured financing and his opinion is based upon the assumption that a conditional commitment satisfies the statute, an assumption that the Court has already found to be untenable. With respect to the staged financing approach, Feaster testified that such an approach is not a viable option for a railroad project of this size. He called it a "non-starter." Given that Feaster has experience in financing railroad construction and Matha has none, the Court accords more weight to Feaster's opinion. Furthermore, the Court is likewise persuaded by the testimony of Taylor, Feaster, and Schieffer regarding the financial community's aversion to uncertainty and instability and the fact that these statutes create just that. The Court finds that, for a project of this size, it is unlikely that a financing commitment can be obtained to satisfy the stat-

ute's requirements, and even if it is possible to obtain such a commitment, it would be very expensive to do so. The fact that a preexisting financing commitment is a necessary component of an eminent domain application imposes upon DM & E a requirement that most likely cannot be satisfied.

The burden upon interstate commerce of blocking a project such as the PRB project is significant. The project will traverse at least three states laying new track in Wyoming, improving much of the existing track in South Dakota and extending into Minnesota. The project will provide rail transportation for low sulfur coal mined in the Powder River Basin as well as providing shipping for numerous other entities. The impact upon interstate commerce of such a large railroad expansion project is obvious, and the fact that the South Dakota statute at issue blocks the project is clear.

■ Against this weighty burden of halting a federally-approved expansion of this instrumentality of interstate commerce, this Court must weigh the putative local benefits. *See Pike*, 397 U.S. at 142, 90 S.Ct. 844. The purported purpose of S.D.C.L. 49–16A–75.3(2) is to protect the rights of landowners by ensuring that the railroad has the financial resources to compensate the landowner for the taking and complete the project. This Court recognizes that this is a legitimate state interest. "If a legitimate local interest is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and whether it could be promoted as well with a lesser impact on interstate activities." *Id.* Based on the record before the Court on this point, the Court must find that the State's interest is outweighed. The State has introduced no evidence that this financing commitment is needed to protect

landowners from financially unstable railroads or that railroads are beginning projects and then abandoning them before they are completed. DM & E's general financial stability has already been demonstrated by the finding of the STB that the PRB project is financially viable. Thus, the Court concludes that under the *Pike* balancing test, the burdens placed on interstate commerce via S.D.C.L. 49–16A–75.3(2) clearly outweigh the local benefit and the provision is therefore unconstitutional.

Unlike subparagraph (2), subparagraph (3) of S.D.C.L. 49–16A–75.3 poses no significant burden upon interstate commerce. DM & E does not argue that it cannot establish that it negotiates with landowners in good faith. Quite to the contrary, DM & E claims to have an exemplary record in dealing with landowners. DM & E recognizes that the good-faith requirement will not prevent the project from being built but contends that it burdens the railroad by creating another layer of regulatory approval that will delay financing and commencement of the project. DM & E in essence argues that the provision is unnecessary because the prior law, which is still in effect, provides more protection to the landowners against a railroad that fails to negotiate in good faith.

Under S.D.C.L. 21–35–1, a entity vested with the privilege of eminent domain must file "a petition in the circuit court for the county in which the property to be taken or damaged is situated, praying that the just compensation to be made for such property may be ascertained by a jury." South Dakota Codified Law 21–35–4 requires that the petition be signed and verified and that the affidavit of verification contain a statement that the proceeding is in good faith. If the amount of compensation awarded by final judgment in an eminent domain proceeding is 20% greater

than the final offer made, and if the total award exceeds $700, "the court shall, in addition to such taxable costs as are allowed by law, allow reasonable attorney fees and compensation for not more than two expert witnesses." *See* S.D.C.L. 21–35–23. Given that a railroad can be liable for these expenses if it offers significantly less than the property is worth, DM & E contends that the law already contains a strong incentive for railroads to negotiate in good faith with landowners. DM & E argues that these statutes contained in Title 21, Chapter 35 sufficiently protect landowners and that S.D.C.L. 49–16A–75.3(3) makes no practical change in the law except to add a level of adversarial proceedings creating additional expense to both the landowner and the railroad.

The State disagrees with DM & E's characterization of S.D.C.L. 49–16A–75.3(3) and argues that the provision creates a substantial change in law. The State points out the new statute requires not only that railroads negotiate in good faith with landowners, but also places an affirmative duty on railroads to establish that they have done so prior to using eminent domain. Under the provisions contained in S.D.C.L. 21–35, the railroad was only obligated to make such a showing if the landowner demanded a hearing. The State contends that S.D.C.L. 49–16A–75.3(3) relieves landowners of the burden of challenging the improper uses of eminent domain by creating a review process that the landowner need not participate in.

The Court finds that S.D.C.L. 49–16A–75.3(3) does create a change in the law and is a legitimate exercise of state power to protect landowners. As long as the law at issue does not unduly burden interstate commerce, it is the State's prerogative to chose the manner in which it desires to advance a legitimate state interest. Here the State has chosen to shift the burden to the railroad to affirmatively establish good

faith prior to exercising eminent domain rather than place the burden on the landowner to demand a hearing to determine the issue. This approach may save the landowner time and litigation expenses. In cases in which the Governor or Commission finds that the good faith requirement has been met, the landowner may choose not to appeal that decision and rather to accept the price offered for the property. In cases in which the Governor or the Commission find a lack of good faith on the part of the railroad, rather than appeal this decision, the railroad may find the better and cheaper course to be to renegotiation with the landowner. Therefore, the Court is not convinced of DM & E's contention that S.D.C.L. 49–16A–75.3(3) merely adds another layer of procedure because it is far from certain that all determinations of the Governor or Commission will be appealed to the courts. It may be that the new approach embodied in 49–16A–75.3(3) is more efficient and actually leads to better protection of landowner rights.

 Given that the state's interest is a legitimate one and that the statutory provision properly advances that interest, in order to invalidate the statute, the Court would have to conclude that the putative local benefit is clearly outweighed by the burden upon interstate commerce. *See Pike*, 397 U.S. at 142, 90 S.Ct. 844. With respect to S.D.C.L. 49–16A–75.3(3), this is not the case. The burden imposed on interstate commerce by this provision is minimal. As Schieffer testified, although he views the provision as unnecessary, he does not see it as a significant barrier to building the PRB project. Likewise, the Court can see no reason why such a requirement would pose significant problems to other railroad projects in the future. Under the prior law, whether a railroad had negotiated in good faith and made

bona fide offer was determined by the court system when the compensation award was rendered. Requiring railroads to prove this same bedrock principle to a different body at a different stage in the process changes very little with respect to the burden of establishing good faith. In light of the minimal burden, if any, imposed on interstate commerce and the significant benefit to landowners, the Court concludes that S.D.C.L. 49–16A–75.3(3) is constitutional.

The plat requirement of S.D.C.L. 49–16A–75.3(4) is an entirely different matter. DM & E offered the uncontroverted testimony of Gigear, the project engineer for the PRB project, that such minute detail as requiring specifications for the entire $2 billion project right down to the switches presents a virtual impossibility. Gigear testified that the PRB project is a design build project and that approximately 5–15% of the design is completed at this point. He stated that DM & E would need to complete the design of the entire project in order to meet the requirement of the statute and that such an endeavor would cost $30 million and take one and a half to two years to complete.

The State attempted to demonstrate at trial that DM & E has already compiled much of the information necessary to meet the requirements of S.D.C.L. 49–16A–75.3(4). Gigear testified, however, that the information DM & E has generated to date is preliminary in nature and subject to change as the design is advanced. He clearly indicated that DM & E cannot at this point verify the engineering specifications and construction methods for the project. Gigear testified that those terms have specific meaning within the engineering industry and that the materials that DM & E has produced in relation to the project do not meet the industry definition. The State offered no contrary expert engineering testimony.

Based upon the testimony of Gigear, the Court finds that S.D.C.L. 49–16A–75.3(4) imposes a significant burden on interstate commerce. While the statute may not impose such a significant burden upon smaller projects, it does create a substantial barrier to a project of this size. Given the magnitude of the PRB project, it is very likely that the project cannot be completed with the statute in place. DM & E does not have the funds nor the time to invest in completely designing this project prior to its construction.

■ The purported local benefit of S.D.C.L. 49–16A–75.3(4) is to allow landowners and the Governor to properly assess the impact of the taking on private property and set compensation by evaluating the scope and methods of the ultimate construction. The Court finds that although the State has again proffered a legitimate purpose, the State's purpose could clearly be met by requirements having a less onerous impact on interstate commerce. The detail required in this portion of the statute is clearly excessive in light of the State's putative interest. Therefore, the Court finds that S.D.C.L. 49–16A–75.3(4) violates the dormant Commerce Clause.

The parties disagree as to the proper interpretation of the final provision of S.D.C.L. 49–16A–75.3. Subsection 5 requires that railroads provide certain utilities with access to its right-of-way for placement of facilities without fee. DM & E contends that the statute requires it to provide these free easements over the entire length of the railroad, and the State claims that the statute only requires the railroad to provide such easements over those portions of the railroad's right of way that were acquired by the use of eminent domain. In support of its position, the State relies on the language in S.D.C.L. 49–16A–75 stating that "[a] rail-

road may exercise the right of eminent domain in acquiring right-of-way as provided by statute, but only upon obtaining authority from the Governor..." The State points out that the term "right-of-way" is the same term used in S.D.C.L. 49–16A–75.3(5). That provision states that "[a] railroad's exercise of the right of eminent domain is a public use consistent with public necessity only if the use of eminent domain ... provides ... the right to use of right-way-of-way for the placement of underground facilities, without fee ..." *See id.* The State contends that reading these two provisions together establishes that the free easements are only required on that portion of the "right-of-way" acquired by eminent domain.

Although the statute is not entirely clear on its face, the Court finds the State's reading of the statute to be persuasive. S.D.C.L. 49–16A–75 sets the parameters for the railroad to obtain land by eminent domain, and in doing so uses the term "right-of-way" to describe the land so acquired. Then in establishing the criteria that the railroad must satisfy in order to obtain eminent domain authority, the statute requires a free easement over the "right-of-way." Reading these two provisions to refer to the same portion of land is logical and consistent. Therefore, the Court concludes that S.D.C.L. 49–16A–75.3(5) only requires that DM & E provide free access to utilities on those portions of the line acquired by eminent domain.

DM & E argues that even if S.D.C.L. 49–16A–75.3(5) only requires free easements on those portions of the line acquired by eminent domain, it still burdens interstate commerce by preventing the railroad from expanding and properly reserving its own property for future communications needs of the railroad. DM & E also contends that the easements will inevitably interfere with railroad operations. The statute does clearly state that

such easements are "subject to reasonable regulation as to location and placement" but DM & E asserts that this means the railroad will be forced to provide such easements in locations that the State deem appropriate.

■ The State contends that S.D.C.L. 49–16A–75.3(5) serves the legitimate state purpose of having the sovereign power of eminent domain limited to public use by requiring that land obtained through public authority be devoted to public uses. This is a legitimate state interest. Although there was no testimony at trial to establish that DM & E had a history of charging excessive rates for utility easements along its line, there was evidence to establish that another railroad, Burlington Northern, had a pattern of engaging in such a practice. Therefore, the State was addressing a legitimate concern when it enacted S.D.C.L. 49–16A–75.3(5) to prevent this practice. DM & E is correct in its assertion that less restrictive alternatives exist, such as setting a cap on fees that can be charged for such easements. The Court, however, is not applying the least restrictive alternative test in the context of this statute because the statute does not discriminate against interstate commerce. Under the less rigorous *Pike* balancing test, the Court must conclude that DM & E has failed to establish the burden upon interstate commerce is clearly excessive in relation to the local benefit. *See Pike*, 397 U.S. at 142, 90 S.Ct. 844.

### 2. *Equal Protection*

■ DM & E argues that S.D.C.L. 49–16A–75 through 49–16A–75.3 violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution because the statutes purposefully discriminate against railroads. DM & E concedes that its equal protection challenge should be reviewed on a rational basis

standard, i.e., (1) whether the challenged statutes have a legitimate purpose and (2) whether the challenged statutes promote that purpose. *See Hoffman v. United States,* 767 F.2d 1431, 1436–37 (9th Cir. 1985). DM & E argues that the State of South Dakota has improperly singled out railroads by subjecting only railroads to the strict requirements of S.D.C.L. 49–16A–75 through 49–16A–75.3 while other entities enjoy eminent domain power without the need to meet such stringent requirements. The Court, however, cannot conclude that South Dakota has violated the Equal Protection Clause in choosing to regulate railroads' use of eminent domain differently than that of other entities. The State has a legitimate interest in protecting private property rights and under the deferential rational basis standard of review, the challenged statutes further that purpose by requiring railroads to meet strict requirements before using the power of eminent domain. The fact that other entities are not subject to the same requirements is of little consequence to the Court because condemnation of property for different purposes involves different concerns and it is legitimate for the State to choose to treat the condemnations in a different manner. For example, the amount of land taken may differ depending on the purpose for the taking. The resultant burden upon the landowner's adjacent property varies depending upon the use to which the condemned property is put. Furthermore, the degree to which the taking benefits the public differs depending upon the nature of the taking. Thus, it is legitimate for the State of South Dakota to legislate that railroad takings conform to a different standard than other types of takings.

### E. *Public Policy*

The final *Dataphase* factor to be considered is public interest or policy. Although the Court agrees with the State's assertion that it is in the public interest to ensure that private exercise of state eminent domain power is used for the public good, the Court finds that the statutes at issue go far beyond providing the public with this assurance. The statutes completely block the implementation of a federally approved rail construction project that has as its purposes to improve existing railways and providing shipping for cleaner burning fuel. Clearly improving rail transportation is in the public interest as is providing shipping for low sulfur coal. Issuing the permanent injunction and potentially allowing the PRB project to move forward is in the public interest.

### F. Takings Issue

DM & E contends that S.D.C.L. § 49–16A–75.3(5) which gives utility businesses a free easement in railroad property constitutes an unconstitutional taking in violation of the Fifth Amendment of the United States Constitution. South Dakota Codified Law § 49–16A–75.3(5) provides as follows:

> A railroad's exercise of the right of eminent domain is a public use consistent with public necessity only if the use of eminent domain:
>
> (5) Provides that electric utilities, public utilities, telecommunication companies, and rural water systems have the right to the use of the right-of-way for the placement of underground facilities, without a fee, subject to reasonable regulation as to location and placement.

*Id.* DM & E claims that this statute provides for the permanent physical occupation of its property without just compensation and is thus unconstitutional. The State argues that the statute is a proper exercise of the State's power to condition the use of eminent domain on obtaining certain concessions from the property owner.

As the United States Supreme Court recently made clear, there are two veins of constitutional analysis in the area of takings law. In *Tahoe–Sierra Preserv. v. Tahoe Reg. Planning*, 535 U.S. 302, 122 S.Ct. 1465, 1479, 152 L.Ed.2d 517 (2002), the Court recognized the "longstanding distinction between the acquisitions of property for public use, on the one hand, and regulations prohibiting private uses on the other." The Court explained that it is inappropriate to use the "regulatory taking" analysis for cases involving physical takings, and vice versa. *Id.* DM & E frames the instant case as a physical taking, and not surprisingly, the State labels it a regulatory taking case.

Clearly the easement that DM & E is forced to grant by the statute creates a permanent physical occupation of its property by the easement holder. As the Court has recognized, requiring a landowner to grant an easement outright presents a physical occupation case and most likely a taking. *See Dolan v. City of Tigard,* 512 U.S. 374, 384, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994); *see also Nollan v. California Coastal Comm'n,* 483 U.S. 825, 834, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987). The issue is more complicated, however, when the easement is compelled as a condition of DM & E seeking to utilize the State's eminent domain power. In this context, the forced grant of an easement is more akin to the regulatory takings cases.

In situations in which a landowner is forced to grant an easement to the public in order to obtain a building permit, the Court has employed a regulatory taking analysis. *See Dolan,* 512 U.S. at 384–85, 114 S.Ct. 2309 (building permit); *Nollan,* 483 U.S. at 834, 107 S.Ct. 3141 (building permit); *Goss v. City of Little Rock, Arkansas,* 151 F.3d 861, 863 (8th Cir.1998) (rezoning application); *but see McKenzie v. City of White Hall,* 112 F.3d 313, 317 (8th Cir.1997) (finding that requiring land-owner to grant public easement in order to obtain rezoning of property involved a physical rather than a regulatory taking). The instant situation is not identical to a building permit or rezoning case because in those situations, the government is concerned with a particular use to which the property will be put and its potential impact on land-use regulation. Thus the government exacts concessions from the property owner that mitigate the impact of the proposed development. Such exactions are viewed by the Court as regulatory in nature. Here, the easement is required of DM & E not to allow it to put the property to a particular use but rather to acquire the property in the first place. Thus, the government is not regulating the use of the land but rather its acquisition. It is reasonable to assume, however, that the South Dakota legislature knew that a railroad would attempt to acquire property by eminent domain in order to allow it to construct its railways and that the legislature crafted S.D.C.L. § 49–16A–75.3(5) with railroad construction in mind.

Another basic difference between this and the typical land-use cases is that here the provision at issue is in the form of a statute rather than the individualized determination of a zoning or planning board with respect to a specific proposed use of a particular parcel of property. This distinction may make it more difficult for the State to satisfy the essential nexus test employed in regulatory takings cases because it may not have made the necessary level of individualized findings with regard to the impact of DM & E's project and the need for the easement to mitigate that impact. This fact, however, does not mean that a regulatory takings analysis is the wrong framework for this case, only that the State may have difficulty meeting its burden. The Court finds that S.D.C.L. § 49–16A–75.3(5) presents a regulatory

taking question since the State is not forcing DM & E to grant the easement outright but rather is conditioning its power to use eminent domain on such a grant.

In regulatory taking cases, the Court must determine "whether an 'essential nexus' exists between the 'legitimate state interest' and the potential condition exacted by the [State]." *Dolan*, 512 U.S. at 386, 114 S.Ct. 2309. If such a nexus is established, then the Court must decide if there is a sufficient degree of connection between the "exactions and the projected impact of the proposed development." *Id.* The Supreme Court has termed the level of connection required as "rough proportionality" and found that it requires that the State make an "individualized determination that the required dedication is related both in nature and extent to the impact of the proposed development." *Id.* at 391, 114 S.Ct. 2309.

In *Dolan* the petitioner applied for a city permit to redevelop her property to nearly double the size of her plumbing and electric supply store and add a paved parking lot. *Dolan*, 512 U.S. at 379, 114 S.Ct. 2309. The city planning commission required that the petitioner dedicate the portion of her property lying in the flood plain for improvement of a storm drainage system and dedicate that land as a public greenway. *Id.* at 380, 114 S.Ct. 2309. This condition was intended to mitigate the impact of the increase in impervious surface area resulting from the petitioner's proposed development and the consequent increase in flood potential. *Id.* at 387, 114 S.Ct. 2309. The city also required that she dedicate an additional 15-foot strip of land as a pedestrian/bicycle path in an attempt to reduce increased traffic congestion that would be caused by the proposed development. *Id.* at 380, 387, 114 S.Ct. 2309.

The Court found that an "essential nexus" existed between the conditions exacted by the city and the advancement of legiti-

mate state interests. *Id.* at 387, 114 S.Ct. 2309. The Court went on to find, however, that exactions required by the city were not "roughly proportional" to the impact of the proposed development. *Id.* at 394–96, 114 S.Ct. 2309. The Court found that although requiring petitioner not to build in the floodplain was a reasonable requirement, the city had no justification as to why the petitioner needed to dedicate that land to a public, as opposed to a private, greenway in the interests of flood control. *Id.* at 393, 114 S.Ct. 2309. The Court found that the city was attempting to impose a permanent recreational easement on the petitioner's property without sufficient findings to show that such an easement was necessary to advance a legitimate state interest. *Id.* at 394–95, 114 S.Ct. 2309. With respect to the pedestrian/bicycle pathway requirement, the Court found that the city had not meet its burden of establishing that increased traffic resulting from the proposed development was reasonably related to the city's requirement for the easement. *Id.* at 395, 114 S.Ct. 2309. The findings of the city only showed that the creation of the pathway "could offset some of the traffic demand ... and lessen the increase in traffic congestion," not that such a benefit would in fact occur or was even likely. *Id.* Although the Court recognized that mathematical precision is not necessary, the city had an obligation to quantify its findings in support of the need for the pedestrian/bicycle pathway. *Id.* at 395–96, 114 S.Ct. 2309. Without such individualized findings, the city could not meet its burden of establishing "rough proportionality" between the condition and a legitimate state interest.

In *Nollan*, the petitioners submitted a permit application to the California Costal Commission in which they proposed to demolish their existing structure and replace it with a larger, three-bedroom house.

*Nollan,* 483 U.S. at 828, 107 S.Ct. 3141. The Commission granted the permit subject to a condition requiring the petitioners to allow a public easement for passage across a portion of their property in order to make it easier for the public to travel between two public beaches. *Id.* The Commission found that the new house would increase blockage of the view of the ocean and contribute to the development of "a wall of residential structures that would prevent the public psychologically from realizing a stretch of coastline exists nearby that they have every right to visit." *Id.* at 828–29, 107 S.Ct. 3141.

The Court recognized that the Commission had the right to deny the petitioner's request for a permit outright and went on to state that permit condition that serves the same purpose as a refusal to issue the permit in the first place does not constitute a taking unless refusal to issue the permit would interfere so drastically with the petitioners' use of their property as to constitute a taking. *Id.* at 835–36, 107 S.Ct. 3141. The Court also, however, stated that "if the condition substituted for the prohibition utterly fails to further the end advanced as the justification for the prohibition," the condition may constitute an unconstitutional taking. *Id.* at 837, 107 S.Ct. 3141. On the facts presented in *Nollan,* the Court found that requiring the petitioners to grant an easement to allow the public to cross their property failed to advance the interest of reducing obstacles to viewing the beach created by the new house and likewise failed to lower any "psychological barrier" to using public beaches. *Id.* at 838, 107 S.Ct. 3141. The Court found that the condition was not a valid land-use regulation but rather constituted a taking. *Id.* at 839, 107 S.Ct. 3141.

The State argues that subsection (5) of S.D.C.L. § 49–16A–75.3 serves the legitimate public interest of ensuring that condemned property is truly devoted to the public interest by requiring that the property be made available for use by public utilities without excessive access charges. The state posits that requiring free easements for public utilities has a close nexus to the purpose of ensuring that private eminent domain use advances the public interest.

DM & E argues that there is no evidence that the proposed railroad expansion automatically interferes with utility line placement and expansion and that there is no evidence that DM & E was guilty of charging excessive fees for easements along its railways. DM & E also contends that a myriad of other options exist for the State that do not require physical occupation of private property.

Dana Nelson, assistant to Governor Janklow, did testify at the hearing that S.D.C.L. 49–16A–75.3(5) was enacted in response to concerns raised by rural utility companies that were having difficulty obtaining easements across railroad property. One railroad in particular, Burlington Northern, was charging several thousand dollars for an easement across its property, and this cost was being passed on the consumer. The State charges a fee for an easement across its property as does DM & E, and the fee charged by DM & E fell between the fee charged by Burlington Northern and the fee charged by the State. Schieffer, the CEO of DM & E, testified that DM & E has not had a problem in the past with respect to easements across its railroad lines.

With respect to the first prong of the analysis, whether an essential nexus exists between the "legitimate state interest" and the condition exacted by the State, the Court finds that such a nexus exists. Ensuring that private use of eminent domain is truly employed for the public good is a legitimate state interest. *See Nollan,* 483 U.S. at 835, 107 S.Ct. 3141

(broad range of governmental purposes can constitute a legitimate state interest). Requiring the railroad to allow access to land it acquired by eminent domain to other public entities and groups that advance public interests furthers the governmental interest in ensuring that the land is used for the public's benefit by increasing the public interests to which the land is put. The State, however, has failed to demonstrate that such a free easement is roughly proportional to impact of the proposed PRB project. The State has offered no evidence of an "individualized determination that the required dedication is related both in nature and extent to the impact of the proposed development." *See Dolan,* 512 U.S. at 391, 114 S.Ct. 2309. The State has offered no evidence of the impact of the PRB construction on utility lines and the need to allow such an easement nor why a free easement is necessary to advance the State's interest. As stated above, the State has introduced evidence that rural utilities were having difficulty obtaining easements across railroad lines and that Burlington Northern Railroad was charging high fees for such an easement, but none of this testimony was linked specifically to DM & E or the PRB project. Like in *Dolan,* here the State has offered a legitimate state interest connected to the condition but failed to offer evidence to establish that the condition is sufficiently tailored to advance the interest. The Court is simply left with little to no evidence on the issue of how the proposed PRB railroad expansion might impact utility easements throughout the state. Without such evidence, the Court is in no position to find that the easement is necessary to offset the impact of the PRB project. Therefore, as applied to DM & E's proposed PRB project, S.D.C.L. § 49–16A–75.3(5) constitutes an unconstitutional taking.

It should be observed that the regulatory taking analysis is difficult to apply to the present case. Other cases applying the regulatory taking analysis involve a specific piece of land with a well defined trade off pursuant to regulation or some other action by a regulatory body. Here there is a state statute which will surely come into play when this project moves forward. There will ultimately be a wide variety of situations where public utilities would make use of the free easements. If the Court were to say that this portion of the claim is not now ripe, then would the adjudication of the constitutionality of the statute be determined when the first free easement was taken or where all easements for a project had been applied for? The situation presented might be much different if the first easement was requested in a sparsely populated area of rangeland as opposed to Brookings, South Dakota, for example. By the time the financing is arranged in this case, this statute might already have been used in some other railroad condemnation. These possibilities point out the difficulty of applying the regulatory taking analysis to a state statute as opposed to a particular regulatory decision.

 Despite those difficulties, the Court finds as stated above that the proper analysis for this case is the framework employed in regulatory takings cases. As an alternative holding, however, the Court finds the outcome would be the same under the analysis for physical takings cases. As the Supreme Court held in *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 426, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982), the "permanent physical occupation [of property] authorized by the government is a taking without regard to the public interest that it may serve." The statute at issue, S.D.C.L. § 49–16A–75.3(5), provides for the permanent physical occupation by way of a free easement of land acquired by the railroad by public

utilities. Such a scenario constitutes a *per se* taking under the holding of *Loretto*.

■ The State also contends that S.D.C.L. § 49–16A–75.3(5) does not constitute a taking because it does not apply to any property interest of the railroad. The State rests this argument on the fact that at the time the application for eminent domain authority is made, DM & E has no interest in the property at issue but rather is applying for the right to acquire the property. From this, the State claims that requiring an easement as an advance condition to the use of eminent domain does not constitute a taking because at the time the regulation is imposed there is no existing right held by the railroad with respect to the property at issue. The Court finds this argument unpersuasive.

The only legal authority cited by the State in support of its argument is clearly distinguishable from the present case. In *United States v. Willow River Power Co.*, 324 U.S. 499, 65 S.Ct. 761, 89 L.Ed. 1101 (1945), the Court held that the damage resulting to a riparian owner from an authorized navigation improvement that raised the level of the water of the navigable stream above the high-water mark did not constitute a taking of property for Fifth Amendment purposes. The Court found that the claimant's interest in the high-water level of the navigable stream did not qualify as a protected property interest. *Id.* at 511, 65 S.Ct. 761. In *Willow River Power Co.*, the riparian owner would not, at any time, have a compensable right with respect to the water level of the navigable stream. The case does not stand for the proposition that requiring the forfeiture of a property right prior to the claimant acquiring an interest in the property cannot constitute a taking. Timing of ownership was not at all at issue in *Willow River Power Co.* The case stands for the rather common sense proposition that in order to have a compensable property interest for takings purposes, the interest at issue must be recognized in the law.

South Dakota Codified Law Section 49–16A–75.3(5) requires DM & E to allow free access by public utilities and others to land that it acquired by use of eminent domain as a condition of obtaining the power to exercise eminent domain authority. The fact that the condition is exacted prior to DM & E obtaining an interest in the property is of little consequence. The actual burden imposed by the easement occurs after DM & E has acquired the property. Prior to acquiring the land, DM & E must agree to provide the free easement, but the easement itself cannot attach to the property until DM & E has actually acquires the property through the exercise of eminent domain. Thus, the Court finds that DM & E has sufficient interest in the burdened property to claim that the statute constitutes an unconstitutional taking.

### G. *Severability*

■ The next task for the Court is to determine whether the statutes at issue are severable. The general rule of severability is that the legislative act should be severed and only the unconstitutional provisions invalidated if the remaining sections can stand by themselves and if it appears that the legislature would have intended the remaining sections to be in effect without the invalidated sections. *See S.D.E.A. v. Barnett*, 582 N.W.2d 386, 394 (1998)(citing *Hogen v. South Dakota State Board of Transportation*, 245 N.W.2d 493 (S.D.1976)). The test for determining whether invalid portions of a legislative act may be severed is:

If they are so mutually connected with and dependent on each other, as conditions, considerations, or compensations for each other as to warrant a belief that the legislature intended them as a

whole, and that, if all could not be carried into effect, the legislature would not pass the residue independently, and some parts are unconstitutional, all the provisions which are thus, dependent, conditional, or connected must fall with them.

*State v. Wilder*, 73 S.D. 330, 341, 42 N.W.2d 891, 897 (1950). The burden to show that the legislature would not have enacted the statute without the severed portions is on the party arguing against severability. *S.D.E.A. v. Barnett*, 582 N.W.2d at 394 (citing 2 Norman J. Singer, *Sutherland Statutory Construction* § 44.04 (5th ed.1992–93)). Where the reviewing court cannot say the legislature would not have enacted the remainder of the law without the offending portions, only the offending portions are to be stricken. *Id.* (citing *Matthews v. Linn*, 78 S.D. 203, 208, 99 N.W.2d 885, 888(1959)).

DM & E argues that the criteria of S.D.C.L. 49–16A–75.3 should not be severed because the unconstitutional portions of that statute constitute the "heart and soul" of the State's restrictions on railroad eminent domain. In support of this proposition, the State cites to *State v. Nuss*, 79 S.D. 522, 114 N.W.2d 633 (S.D.1962). At issue in *Nuss* was a South Dakota statute that capped the amount of advance tuition that certain institutions could collect. *Id.* at 634. The statute at issue read as follows:

> No person, firm or corporation or any college or school, which is not supported by a church or religious organization, or a fraternal organization, or by the state or any of its political subdivisions, shall collect tuition or other charges in excess of twenty-five dollars in advance of actual attendance of pupils in such school. Charges for correspondence courses shall not exceed twenty-five dollars in advance of the receipt and approval by the pupil of the first assignment of such courses. No action shall lie to recover on a contract for tuition or other charges from a prospective student in advance of such attendance, or receipt and approval by the pupil of the first assignment of correspondence courses. Any violation of this provision shall be a misdemeanor and upon conviction thereof such violator shall be subject to a fine of not to exceed two hundred dollars or by imprisonment in the county jail not to exceed thirty days.

*See id.* The court in *Nuss* found that the "main stem of the act is the prohibition against collecting tuition or other charges in excess of twenty-five dollars in advance of actual attendance of the pupils in school" and that this portion of the statute constituted "an unreasonable, unnecessary, and unwarranted invasion of the defendant's freedom of contract." *Id.* at 636–637. The court went on to find that because the limitation on the amount of advance tuition was central to the challenged statute, the legislature would not have enacted the remainder absent the unconstitutional provision, and thus the statute was not severable. *Id.* at 638.

■ Here, the Court cannot say that the South Dakota legislature would not have enacted S.D.C.L. 49–16A–75.3(3) without subparagraphs (1), (2), (4) and (5). Without the offending portions, S.D.C.L. 49–16A–75.3 still contains the important requirement that the railroad establish that it negotiated in good faith to privately acquire the property at issue before resorting to eminent domain. This provision provides significant protection to the landowner, and the legislature likely would have enacted such a requirement even absent the stricken provisions. Therefore, unlike in *Nuss* where the offending portion of the statute constituted the only real substance of the law, here the statute has significant meaning and purpose even without the offending portions. Thus, the

Court finds that the provisions of S.D.C.L. 49–16A–75.3 are severable and will only strike the unconstitutional parts of the statute.

DM & E also argues that S.D.C.L. 49–16A–75 through 49–16A–75.3 cannot be severed and should all be stricken in total. DM & E contends that the administrative proceedings established by S.D.C.L. 49–16A–75 through S.D.C.L. 49–16A–75.2 would not have been enacted absent the criteria of S.D.C.L. 49–16A–75.3. DM & E asserts that even if the good faith criteria of S.D.C.L. 49–16A–75.3(3) remains, the statutes at issue are not severable. DM & E argues that if the only criteria for determining "public use consistent with public necessity" is that the railroad establish good faith, the legislature would not have chosen to force a landowner to go through an adversarial administrative procedure to contest good faith, only to later be faced with a trial on compensation.

DM & E's argument rests on the proposition that the good faith requirement of S.D.C.L. 49–16A–75.3(3) and its accompanying procedure is burdensome to the landowner and fails to offer any significant protection to the landowner. The Court, however, has already stated that S.D.C.L. 49–16A–75.3(3) has potentially significant benefits to the landowner. As stated above, the State has chosen to shift the burden to the railroad to affirmatively establish good faith prior to exercising eminent domain rather than place the burden on the landowner to demand a hearing to determine the issue. This approach may save the landowner time and litigation expenses. In cases in which the Governor or Commission finds that the good faith requirement has been met, the landowner may choose not to appeal that decision and rather to accept the price offered for her property. In case in which the Governor or the Commission find a lack of good faith on the part of the railroad, rather than appeal this decision, the railroad may find the better and cheaper course to be to renegotiation with the landowner. Therefore, the Court is not convinced of DM & E's contention that S.D.C.L. 49–16A–75.3(3) merely adds another layer of procedure because it is far from certain that all determinations of the Governor or Commission will be appealed to the Courts. It may be that the new approach embodied in 49–16A–75.3(3) is more efficient and actually leads to better protection of landowner rights.

 Therefore, the Court finds that S.D.C.L. 49–16A–75 is severable from the offending portions of S.D.C.L. 49–16A–75.3. Although S.D.C.L. 49–16A–75 requires the Governor to look to S.D.C.L. 49–16A–75.3 for the criteria to use in evaluating eminent domain applications, as previously stated, S.D.C.L. 49–16A–75.3 still contains the significant good faith criteria. Likewise, the Court finds that both S.D.C.L. 49–16A–75.1 and 49–16A–75.2 are severable from the offending portions of S.D.C.L. 49–16A–75.3. Requiring the commission to promulgate to rules to guide the application process and placing the burden of showing public use and necessity upon the railroads are not so inextricably linked to the particular criteria of S.D.C.L. 49–16A–75.3 for the Court to conclude that those provisions would not have been passed independently of the specific criteria. Thus, the Court finds that the statutes at issue are severable and only those offending portions, S.D.C.L. 49–16A–75.3(1),(2), (4) and (5) will be stricken.

IT IS ORDERED:

(1) that the State of South Dakota is permanently enjoined from enforcing S.D.C.L. 49–16A–75.3(1),(2),(4) & (5);

(2) that the State of South Dakota is permanently enjoined from enforcing

S.D. Admin. R. 70:08:01:03 and 70:08:01:04.